Argued November 8; affirmed December 15, 1936; rehearing
denied January 19, 1937

# FLEMING *v.* AMBULANCE CO.

(62 P. (2d) 1331, 64 P. (2d) 519)

Department 2.

*James A. Powers,* of Portland (Philip A. Joss, of Portland, on the brief), for appellant.

*Glenn R. Jack,* of Oregon City (Butler & Jack, of Oregon City, on the brief), for respondent.

BEAN, J. The accident occurred as follows: On April 2, 1935, at about 7:30 o'clock, p. m., just after dark, plaintiff was driving her mother's car in a southerly direction on the Super-highway, a concrete pavement and dry at the time, approaching the city limits of Gladstone. Observing an ambulance and hearing the siren, plaintiff drove her automobile off the highway so that two wheels were off the shoulder and two wheels were at the edge of the shoulder, following at a slow rate of speed directly behind a double hayrack equipment driven by E. A. Hackett, which hayrack equipment, drawn by a team of horses, was off the pavement. Previously an accident had occurred near Oak Grove, northerly on the Super-highway from the scene of which accident the Oregon City black ambulance, which was built over from a sedan, and defendant's ambulance was traveling in a southerly direction. At the approximate point where the plaintiff was driving her car behind the hayrack the Oregon City white ambulance was going north, returning to the scene of the

first accident, and the defendant's ambulance was traveling south immediately behind the black ambulance from the Oregon City hospital, the defendant's ambulance having left the scene of the first accident immediately after the black ambulance and having followed the black ambulance up to the scene of the accident where plaintiff was injured. Eugene Osborn was driving the defendant's ambulance and Frank Mulligan, ambulance attendant, was in the back of the ambulance beside the cot on which the patient, whom he was tending, was lying. The siren was going and the speed of the ambulance, a 1927 or 1928 Packard, was between 40 and 45 miles an hour. In front of the defendant's ambulance was the black ambulance, which would not yield to the defendant's siren. When defendant's ambulance was from 75 to 150 feet behind, the black ambulance, without warning, jammed on its brakes and then suddenly shot out to the left, leaving the car plaintiff was driving directly ahead of defendant's ambulance. Osborn put on his brakes as soon as he could after the black ambulance had cut its speed and he turned defendant's ambulance to the left to avoid striking plaintiff's car. Just after the black ambulance had passed around plaintiff's car, another ambulance, white in color, started to pass in the opposite direction, that is, north. Faced with the danger of hitting the approaching ambulance head-on, Osborn swung back and struck plaintiff's car on the left rear portion. Plaintiff's car ran into the end of the rear hayrack and a pole protruding from the hayrack went through the left part of the windshield, and plaintiff was seriously injured by being thrown or struck when the front seat of her car was broken loose from the sides where it was fastened and plaintiff was removed from the car. Plaintiff was rendered unconscious and was first transported to the

hospital and immediately removed to her home; the next morning, April 3, she was removed to the Oregon City hospital by ambulance, in which hospital she remained continuously up to the time of the trial on November 25, or more than seven and one-half months.

Plaintiff incurred expenses up to the time of the trial consisting of doctor bills in excess of $500, hospital bills in the amount of $1020, X-rays, laboratory and diathermy and intravenous treatments, druggist expenses and special nurse's services in a sum in excess of $711.50.

Plaintiff, at the time of the accident, was approximately 35 years of age and had been a music teacher for a period of approximately eight years, maintaining a studio in Oregon City, and was teaching about 45 hours a week, earning $125 a month, with which she supported herself and three boys. As a result of the accident she suffered the complete loss of her class of pupils.

Upon the trial when nearly all the testimony was concluded, the defendant moved for a directed verdict in its favor. Upon the completion of plaintiff's rebuttal testimony defendant moved for a directed verdict. The motion was overruled but no exceptions were taken by defendant. There is some contention that an exception was taken to the overruling of the motion and not noted by the reporter. We, however, take the bill of exceptions as a verity.

The same question is involved in defendant's assignment that the court erred in denying defendant's motion for a new trial on the ground of insufficiency of evidence to support the verdict, in that plaintiff failed to prove defendant's liability on the ground of *respondeat superior*. In any event, we feel constrained

to examine the question of whether the evidence supports the judgment.

Defendant introduced an agreement between the Ambulance Company and Miller's Garage, which agreement is as follows:

## "AGREEMENT

"THIS AGREEMENT, Made and entered into this 13th day of March, 1935, by and between Ambulance Company, an Oregon Corporation, hereinafter called the first party and Gordon Miller, doing business under the firm name and style of Miller Garage, hereinafter called the second party, WITNESSETH: That Whereas, the first party is the owner of a certain ambulance,

And Whereas, the parties hereto desire to make an arrangement whereby the second party will care for, store and operate said ambulance for the purpose of bringing sick and injured persons from any reasonable distance to Oregon City, or other points,

Now, Therefore, It is agreed by and between the parties hereto that the first party hereby turns the possession and control and use of said ambulance over to the second party and the first party agrees to, at its own cost and expense, keep said ambulance equipped with clean linen, blankets and first aid supplies and agrees to keep said ambulance insured in some reliable insurance company for liability and property damage so as to protect both parties hereto from liability, either as to persons or property from the operation and maintenance of said ambulance.

In consideration thereof the second party agrees to keep said ambulance in repair and furnish the labor for the same and repair parts for the same, also tires at his own cost and expense. The second party further agrees, at his own cost and expense, to furnish the necessary gas, oil and grease for the operation and maintenance of said ambulance and keep the same washed up in a reasonably clean condition and to furnish drivers and assistants for the operation of said ambulance and car license for the same and keep a phone listed in the Oregon City phone book under

the name of Ambulance Company, and to answer and serve all reasonable calls for the service of said ambulance.

The second party shall make whatever charge he deems reasonable for the service of said ambulance and endeavor to collect the same and pay to the first party 10% of the gross monies so collected and retain 90% thereof for his own use which shall be in full consideration for said services by the second party as herein outlined. Said 10% of said gross monies collected shall be in full payment for the first party's furnishing said ambulance, linen, blankets, first aid supplies and insurance.

It is understood and agreed that this contract and agreement shall be and remain in full force and effect for one year from date hereof and indefinitely thereafter, unless either party hereto shall, not less than 90 days before the termination of any one year, notify the other in writing of its or his intention to terminate this contract, in which case the contract shall terminate upon the 13th day of March following such notice.

In Witness Whereof, The parties hereto have hereunto set their hands and seals the day and year first above written. Ambulance Company, By C. A. Stuart, M. D., First Party. W. Ross Eaton, Albert Mount, Gordon Miller, Second Party.''

It may be conceded that if the ambulance was rented to Miller by the defendant and Miller, or his servant, was in charge thereof at the time of the accident, the defendant would not be liable: *Nash v. Baun,* 124 Or. 485 (264 P. 846).

It appears that the Ambulance Company was projected and organized by certain physicians who did not desire to personally operate the ambulance, and they made an ''arrangement'' with Gordon Miller, doing business as the Miller's Garage, to furnish the necessary gas, oil and grease, to take care of, repair the same, and furnish drivers and assistants for the

operation of the ambulance, and to wash and operate the ambulance for them. The Ambulance Company was to keep the ambulance equipped with clean linen, blankets, first aid supplies, and to keep the ambulance insured for liability and property damage to protect both parties from liability. Miller was to charge and collect for the services of the ambulance and pay the Ambulance Company 10% of the gross moneys so collected, and retain 90% thereof in full consideration for his services.

It is noticed by the terms of the agreement that no provision is made for Miller to use the ambulance for any other purpose than "bringing sick and injured persons from any reasonable distance to Oregon City, or other points."

It is indicated by the agreement, and all the circumstances, that Miller was simply an agent or manager for the Ambulance Company. It is not important whether Miller drove the ambulance himself or had one of the men drive it who worked in his garage. By the terms of the agreement Miller was to furnish a driver for the ambulance and an assistant or attendant.

The testimony fairly shows, and the jury was warranted in finding, that the Ambulance Company was the owner of the ambulance and made an "arrangement" for Gordon Miller to take care of and operate the same, bringing sick or injured persons to Oregon City and elsewhere; that from the written agreement and circumstances delineated by the testimony Miller was the active manager and agent of the company, as there was no other active officer or person to transact the business of the company; that the office telephone was in the name of the Ambulance Company; that Eugene Osborn, the driver, and Frank Mulligan, the assistant or attendant, at the time of the accident, were

employed by the Ambulance Company through Miller.

In 2 Mechem on Agency, (2d Ed.) 1449, § 1866, we read:

"But in order to make the master liable, under the doctrine of *respondeat superior*, it is necessary to show that the act complained of was done by the master's servant, or by someone whom the servant was authorized to employ, or that the injury complained of was, under the doctrines governing the legal cause, the consequence of some act or omission on the part of the master's servant."

It is unquestioned that Gordon Miller was engaged by the Ambulance Company to operate the ambulance. He was specifically authorized to furnish drivers therefor, so that Eugene Osborn was regularly employed by the defendant, by their authorized agent, Gordon Miller. The services to be performed were directed by the defendant, as indicated by the written memorandum. Miller was to keep the ambulance washed up, to furnish drivers and assistants in the operation of the ambulance, keep a telephone listed in the Oregon City Telephone Book under the name of Ambulance Company, and to answer all reasonable calls for the services of said ambulance. Frank Mulligan, the attendant, testified that he was employed and paid by the Ambulance Company, and, as far as shown Osborn was employed and paid in the same manner, through Miller. Miller had no interest in the ambulance except to operate it for compensation, which he did, as manager, for about a year and a half.

It is shown that Frank Mulligan was injured at the same time that the plaintiff was, and an application was made by Frank Mulligan to the Industrial Accident Commission of Oregon for compensation on account of Mulligan's injury. The Ambulance Company re-

ported the accident to the Industrial Accident Commission, the report showing, as follows:

"Firm Name: Ambulance Co. Signed by Gordon Miller, Title: Mgr. Business: ambulance service. Address: 9th & Main Sts. Signed at Oregon City, Oregon, this 3rd day of April, 1935."

Mr. Miller testified, in effect, that they, meaning the officers of the Ambulance Company, knew the report was made by the Ambulance Company, by him as manager and that he had, to their knowledge, done business in that way for about a year and a half. Any of the doctors interested in the Ambulance Company could call for the ambulance and direct it where to go.

Mulligan, it appears, was paid by the trip when rendering his services on the ambulance. The jury was warranted in finding that Miller was the agent and manager of the Ambulance Company and as such manager employed Eugene Osborn and directed his services for the company. The company had the right, for good reason, through Miller, to discharge Osborn at any time.

5 Blashfield's Cyclopedia of Automobile Law, 99, § 2964, reads in part:

"Thus, where the owner of a taxi paid for its upkeep, had his name on it, and paid for the license, a driver whose term was indefinite, and who did nothing except buy the gasoline and drive the car and receive all in excess of 10 cents per mile for his compensation, was an agent and not an independent contractor or lessee of the owner, and the latter was liable for negligence of the driver, although he could go where he pleased and fix his own charges." Citing *Fitzgerald v. Cardwell*, 207 Mo. App. 514 (226 S. W. 971).

It is unnecessary to determine or decide whether Miller was more than an agent or manager of the company; that is, whether he was a joint adventurer or a

partner with the Ambulance Company, as that question is not involved in the case.

Evidently the jury noticed that by the terms of the agreement, while the regular officers of the Ambulance Company took no part in the actual operation of the ambulance, the company was interested, and it agreed "to keep said ambulance insured in some reliable insurance company for liability and property damage so as to protect both parties hereto from liability, either as to persons or property from the operation and maintenance of said ambulance." The company, by its officers, sent its ambulance out to be operated on the highway and clearly acknowledged its liability for damage in the operation and maintenance of the ambulance.

We do not deem it important that Miller was paid for his services by a percentage of the earnings of the ambulance.

■ Eugene Osborn, operator of the ambulance, was unquestionably grossly negligent in attempting to pass plaintiff's car and two hayracks when the way was not clear and there was an oncoming car.

It is stated in 39 C. J. 35, § 4:

"The relation of master and servant exists whenever the employer retains the right to direct the manner in which the business shall be done, as well as the result to be accomplished, or, in other words, not only what shall be done, but how it shall be done. * * *"

We find in Woods on Master and Servant, (2d Ed.) 624, § 317:

"The real test by which to determine whether a person is acting as the servant of another is, to ascertain whether, at the time when the injury was inflicted, he was subject to such person's orders and control, and was liable to be discharged by him for disobedience of orders or misconduct; * * *" *Oregon Fisheries Co. v. Elmore Packing Co.* 69 Or. 340 (138 P. 862).

■ Undoubtedly Miller, under the terms of the written agreement, was under the control and direction of the Ambulance Company and could be discharged by it for misconduct; so also would Eugene Osborn, the driver, who was under the direction, control and subject to the orders of the Ambulance Company, acting by and through its agent and manager, Miller. It is a matter of general knowledge that a corporation employs labor, such as Osborn, a chauffeur, by its manager or agent, without the officers of the corporation having any direct contact with such employee.

■ The written agreement is somewhat peculiar and the meaning is not perfectly clear. Therefore, it was proper for the court to submit the question of the agency of Miller, under the agreement, to the jury, and all the testimony and circumstances showing how the business had been conducted for about a year and a half, according to the construction of the memorandum by the parties themselves.

We do not construe the agreement as a lease, as contended for by defendant. In defendant's brief the agreement is designated "Lease Agreement." Nowhere in the agreement do we find the word "lease" or that a lease of the ambulance is indicated.

Defendant contends that Miller was an independent contractor. If the ambulance had been rented to Miller he would have been entitled to use it for any reasonable purpose, other than carrying sick and injured persons to the hospital. Under the agreement he was not entitled to use the ambulance for any purpose except that indicated in the agreement.

In *Doherty v. Hazelwood Co.*, 90 Or. 475 (175 P. 849, 177 P. 432), the syllabus reads:

"Ownership of an automobile operated by an agent constitutes a prima facie case for the jury of the prin-

cipal's liability for injuries inflicted by the agent in driving the machine of which he had general charge, although for a purpose of his own, in view of Section 796, L. O. L. [§ 9-804, Oregon Code 1930], authorizing an inference of fact to be founded on the 'course of business.' "

In *Millar v. Semler,* 137 Or. 610 (2 P. (2d) 233, 3 P. (2d) 987), we read:

"Under the former decisions of this court it is settled law in this state that proof of ownership of an automobile negligently operated and causing injury is sufficient to make a prima facie case against the owner for the injuries sustained, although such owner is not present at the time." See also *West v. Kern,* 88 Or. 247 (171 P. 413, L. R. A. 1918 D, 920); *Houston v. Keats Auto Co.,* 85 Or. 125 (166 P. 531).

The question whether the relationship between the Ambulance Company and Gordon Miller, under all the evidence, was one of employer and employee, or agent, or one of independent contractor is a question of fact to be submitted to the jury by the court with proper instructions, and determination by the jury is final. There is no criticism of the instructions to the jury: *Doherty v. Hazelwood Co.,* supra; *Millar v. Semler,* supra; *West v. Kern,* supra. In the case of *Commercial Credit Co., Inc. v. Groseclose,* (Tex.) 66 S. W. (2d) 709, the court, in discussing the question as to the liability of defendant for the operation of a car, as recorded at page 713, said:

"Upon the issue as to the independence of the contract, the court did not err in refusing to withdraw such issue from the jury. Viewed in its aspect most favorable to appellant, the issue was no more than one of fact for the determination of the jury." [citing authorities.]

The case of *Tyler v. MacFadden Newspapers Corporation,* 107 Pa. Super. 166 (163 Atl. 79), cited by de-

fendant upon the question of Miller being an independent contractor, fairly shows such an independent contract. That case is entirely different from the one at bar. In that case the MacFadden Newspapers Corporation rented to Morris Rosen, contractor, two trucks on agreement that the contractor would purchase said trucks and pay for the same in installments. The contractor was to operate the trucks, paying salaries for chauffeurs when necessary, repairs, gasoline and such other supplies as might be required to keep the trucks in first class operating condition, for which he was to be paid $75 per week for the first truck and $65 for each additional truck he operated under the contract, together with a bonus of $52 at the end of one year for each car operated, and a bonus of 5 per cent on all increased sales. When said trucks were fully paid for, title was to be turned over to the contractor. It was held that Rosen was an independent contractor.

In *Houston v. Keats Auto Co.*, supra, we find the following at page 129:

"Where plaintiff proves that the vehicle which caused the damage belonged to the defendant, the jury is entitled to infer that the driver was defendant's servant and that the vehicle was being used for defendant's purposes." Citing and quoting from 1 Shearman & Redfield on Negligence, (6th Ed.) § 158.

At page 133 of the same report we read:
"The mere contract between defendants and Chance could not relieve defendants of liability if Chance were in fact under their control and especially if he were engaged in the transaction of their business at the time of the accident."

The jury was warranted in finding that the business of the Ambulance Company was to bring sick and injured persons to the hospital in Oregon City; that the

written memorandum authorized Gordon Miller to employ a driver, and that therefore Eugene Osborn was the servant of defendant and engaged in its business and acting within the scope of his employment at the time of the accident and was, through Miller, subject to its control at all times.

It is unimportant whether Miller's employment was indicated by a written contract or whether he was engaged orally.

· We have examined other assignments of error and find no grounds for reversing the case therein.

Finding no error in the record, the judgment of the circuit court is affirmed.

RAND, BAILEY and KELLY, JJ., concur.

---

Petition for rehearing denied January 19, 1937

ON PETITION FOR REHEARING
(64 P. (2d) 519)

BEAN, C. J. Defendant has filed an urgent petition for a rehearing. There is some confusion in regard to the record. In our references to the facts in the case it was intended to state what the testimony tended to show, or, what is the same thing, what the jury was warranted in finding, and not to find the facts. There can be no question but that the jury is the judge of the facts in the case and the credibility of all the witnesses. We may not have prefaced each paragraph of our former memorandum with the statement that "the testimony tends to show". Such statement perhaps was mentioned only twice in our former memorandum.

■ Counsel for defendant challenges a statement in ·our former opinion, saying that "there appears in the opinion a misapprehension of the facts. We have reference to the court's statement respecting the operating

of the ambulance by the parties for a period of a year and a half. * * *'' Information furnished to the jury on that point, which was evidently overlooked by counsel for defendant in the preparation of the petition for rehearing, possibly on account of new counsel appearing in the case, may be found first on page 140 of the transcript, the testimony of Frank Mulligan, a witness for defendant, who testified in regard to being employed in connection with the ambulance. We quote:

"Q. Mr. Gordon Miller told you you would be working for the Ambulance Company?

A. That is what he told me; when I was working with the ambulance it was the Ambulance Company.

Q. When did he tell you that?

A. It has been a year and a half ago, or such matter.''

Again on page 142 of the transcript:

"Q. Mr. Miller told you you were working for the Ambulance Company?

A. Yes, sir.

Q. And that was just at the time you went to work?

A. It has been about a year and a half ago.''

We are not aware that the time Miller had been operating the ambulance was questioned.

Mr. Miller, testifying in regard to the employer's report of Frank Mulligan's injury to the State Industrial Accident Commission, which was made in the name of the Ambulance Company, by Gordon Miller, as shown on page 206 of the transcript, said:

"Q. Did you sign this instrument with the knowledge, consent and acquiescence of the officers of the Ambulance Company?

A. They knew about it. I didn't ask them at the particular instance, but that is the way I always conducted the business, and they were familiar with the case at the hospital, and they knew the report was going in under Ambulance Company.''

We understood the testimony at the time of writing the former opinion, and understand it now, as indicating or "tending to show" to the jury that Miller had been doing business for the Ambulance Company for about a year and a half. It would have been more accurate in the opinion where reference is made to submitting the question of the agency of Miller, under the agreement and all the circumstances showing how the business had been conducted for about a year and a half, to the jury "according to the construction of the memorandum by the parties themselves," to have added, "during a portion of that time." We fail to see that it is very material. It is certainly not a pivotal question. There was no doubt in our minds that the agreement, copied in our former opinion, constituted Miller an agent or manager of the defendant Ambulance Company, which was the main question in the case. Denominating that agreement a "lease," as was done in defendant's brief, does not make it a lease.

■ We have carefully read all of the testimony in the case and believe that the question of the amount of the damages was one for the jury. This question is discussed in the brief on petition for rehearing. We do not think that as a matter of law we can say that there was no testimony to support the verdict of the jury fixing the amount of the damages.

The other questions referred to we think were all gone over in our former opinion. We find no reversible error in the record.

The petition for rehearing is denied.

RAND, BAILEY and KELLY, JJ., concur.