Argued September 11; affirmed October 24, 1947

# BOWSER *v.* STATE INDUSTRIAL ACCIDENT COMMISSION

185 P. (2d) 891

*C. S. Emmons,* Assistant Attorney General, of Salem (with George Neuner, Attorney General; T. W. Gillard, Assistant Attorney General; Roy K. Terry, Assistant Attorney General; all of Salem, on the brief), for appellant.

*Harry George Jr.,* of Portland, for respondent.

WINSLOW, J., (Pro Tempore).

This is an appeal from a judgment of the circuit court of the State of Oregon for Multnomah County determining that respondent, Ed C. Bowser, was an employee of McDonough Logging Company at the time he received certain injuries and that he is, therefore,

entitled to compensation under the provisions of the Workmen's Compensation Act, hereafter referred to as the Act.

Respondent was a log hauler furnishing his own truck and hauling logs for the company at stated prices per thousand. He was hauling for the company from their logging show in "God's Valley," on the north fork of the Nehalem River, to Warrenton, Wheeler and Mohler, depending upon the instructions of the company. The respondent's claim was rejected by the Commission upon the ground that he was an independent contractor rather than an employee. An appeal was taken, and the circuit court found that he was an employee. From that determination this appeal has been prosecuted.

The sole issue presented is: Was respondent an employee or an independent contractor at the time of the accident? The question is not an easy one to determine. The difficulty is not in stating the rule applicable, but in applying it. The general distinction between an employee on the one hand, and an independent contractor on the other, is well understood. Often, in a particular case, characteristics of both relationships are present. It is in such cases that the question becomes difficult. The record in this case presents many indicia of both such relationships.

■ However, our determination of the question is not to be based upon an original inquiry. We are limited by the findings of fact of the trial court so long as they are supported by substantial evidence. There is no contention that such findings are not adequately supported herein. Reference will be made to the findings in connection with our consideration of the different tests of such relationships.

Counsel for the Commission made this statement at page 7 of their brief:

"The appellant respectfully states to the Court that there is no such a thing as a controlling or final test in an independent contractor case, and further states to the Court that this or any other court can arrive at a decision and then find plenty of law to sustain and support that decision regardless of which decision is made."

That different results or conclusions have been arrived at from the same state of facts is only natural. It depends, to some degree, upon the purpose sought to be accomplished by the act being administered. This is pointed out by the Supreme Court of the United States in the recent case of *United States v. Silk,* — U. S. —, 67 S. Ct. 1463, 91 L. Ed. 1335, decided June 16, 1947:

"The problem of differentiating between employee and an independent contractor or between an agent and an independent contractor has given difficulty through the years before social legislation multiplied its importance. When the matter arose in the administration of the National Labor Relations Act, we pointed out that the legal standards to fix responsibility for acts of servants, employees or agents had not been reduced to such certainty that it could be said there was 'some simple uniform and easily applicable test.' The word 'employee,' we said, was not there used as a word of art, and its content in its context was a federal problem to be construed 'in the light of the mischief to be corrected and the end to be attained.' We concluded that, since that end was the elimination of labor disputes and industrial strife, 'employees' included workers who were such as a matter of economic reality. The aim of the Act was to remedy the inequality of bargaining power in controversies over wages, hours and work-

ing conditions. We rejected the test of the 'technical concepts pertinent to an employer's legal responsibility to third persons for acts of his servants.' This is often referred to as power of control, whether exercised or not, over the manner of performing service to the industry. Restatement of the Law, Agency, § 220. We approved the statement of the National Labor Relations Board that 'the primary consideration in the determination of the applicability of the statutory definition is whether effectuation of the declared policy and purposes of the Act comprehend securing to the individual the rights guaranteed and protection afforded by the Act.' ''

■ The purpose of the Act under consideration here is expressed in Section 102-1701, O. C. L. A., and succinctly stated in *Hinkle v. State Industrial Accident Commission,* 163 Or. 395, 399, 97 P. (2d) 725, as follows:

" * * * Its purpose is to require industry to carry burden of personal injuries suffered by employees arising out of and in the course of their employment."

■ That the Act should be liberally construed for the accomplishment of its purposes has so often been announced by this and other courts that citation thereto is unnecessary.

The Act provides:

"The term 'employer', used in this act, shall be taken to mean any person, including receiver, administrator, executor or trustee, who shall contract for and secure the right to direct and control the services of any person, and the term 'workman' shall be taken to mean any person who shall engage to furnish his or her services, subject to the direction and control of an employer.

"If any person engaged in a business and subject to this act as an employer, in the course of such

business shall let a contract the principal purpose of which is the performance of labor, such labor to be performed by the person to whom the contract was let or by such person with the assistance of others, all workmen engaged in the performance of the contract shall be deemed workmen of the person letting the contract, if the person to whom the contract was let was not engaged in a separate business involving the occupation covered by the contract at the time of commencing the performance of the contract." O. C. L. A. § 102-1703.

The second paragraph of this statute is not applicable here because the "principal purpose" of this arrangement was not the "performance of labor" but rather the hauling of logs.

In *Landberg v. State Industrial Accident Commission,* 107 Or. 498, 502, 215 P. 594, this court said:

"The word 'workman' as employed in the act was held in Anderson v. State Industrial Accident Com., ante, p. 304 (215 Pac. 582), to mean, as the act states, ' "any person, male or female, who shall engage to furnish his or her services subject to the direction or control of an employer." This implies a legal conception entirely different from that of an independent contractor. To be a workman within the meaning of the statute, there must be an employer, and this employer must contract for and secure the right to direct and control the services of the workman while the workman himself must engage to furnish his services subject to the direction or control of the employer.' "

In *Scales v. First State Bank,* 88 Or. 490, 496, 172 P. 499, we said:

"In Powell v. Virginia Construction Co., 88 Tenn. 692 (13 S. W. 691, 17 Am. St. Rep. 925, 928), Mr. Justice Lurton says that 'an independent contractor is one who, exercising an independent em-

ployment, contracts to do a piece of work according to his own methods, and without being subject to control of his employer, except as to the result of his work.' While it is not always easy to frame a definition which accurately states essential elements and at the same time is capable of being applied to all cases, the one just given has the merit of being concise and also has the prestige that follows from frequent judicial approval: Pottorff v. Fidelity Coal Mining Co., 86 Kan. 774 (122 Pac. 120; Humpton v. Unterkircher, 97 Iowa 509 (66 N. W. 776); Good v. Johnson, 38 Colo. 440 (88 Pac. 439, 8 L. R. A. (N. S.) 896). Stated broadly, the test for determining whether a person employed to do certain work is or is not an independent contractor, is the control which the employer reserves over the work and has the right to exercise. Where the person doing the work is an independent contractor the will of the employer is represented in the result contracted for while the general control over means and methods is given to the contractor.''

Again, on page 499:

'' * * * the relation is to be determined from all the *indicia* of control.''

The cases on the particular subject under consideration are too numerous to permit a detailed consideration thereof. We shall, therefore, use as our guide in our further consideration of the question presented the tests as enumerated and set forth in three comprehensive notes in A. L. R. covering the subject of teamster or truckman as independent contractor or employee under workmen's compensation acts. 42 A. L. R. 607; 43 A. L. R. 1312; 120 A. L. R. 1031.

We shall likewise refer to a discussion of the same tests as set forth in 4 Schneider, Workmen's Compensa-

tion Text, 164, § 1136, entitled "Workmen and Teamsters." Schneider, in his work referred to commencing with section 1065, page 16, classifies these tests as primary and secondary. He designates control as the primary test and the others as secondary.

We shall now give consideration to these tests and analyze the findings of the trial court with reference thereto.

■ Control. In our consideration of this matter, we call attention to the fact that lack of control must give way to the right of control. The author of the note in 120 A. L. R. 1031 makes this statement:

> "In accord with the principles laid down in many other decisions not within the scope of the annotation, making the right of control of the progress of the work or the manner of accomplishing the result an essential feature or distinguishing criterion as to whether one performing the work is an employee or an independent contractor, are numerous recent cases which have recognized or applied this test of right of control in determining the status of a teamster or truckman as an independent contractor or employee, under workmen's compensation acts."

Numerous cases are cited.

Again, Schneider, supra, at page 16, makes this statement:

> "Authorities are numerous and uniform, however, in the different jurisdictions that the primary test is to be found in the factual situation that the employer has or has not retained the right of control over the worker. If he has, the worker is an employee, otherwise an independent contractor."

See cases, note 5.

Likewise, this court, in *Brothers v. State Industrial*

*Accident Commission,* 139 Or. 658, 664, 12 P. (2d) 302, used this language, quoting from *Becker et al. v. Industrial Accident Commission,* 212 Cal. 526, 298 P. 979:

" ' We, of course, have in mind that the true test of the relationship of employer and employee is not the actual exercise of control, but the right to exercise control—not the actual interference by the employer with the manner and method of accomplishing the result, but the right to interfere. * * * , , ,

Now, let us give consideration to the facts in this case as found by the trial court:

"(9) That plaintiff was expected to report to have his truck loaded every morning that the loading crew worked at the time said crew was ready to start work which was agreed to be 7:30 AM.

"(10) That said loading work was not carried on beyond 4:30 PM each day.

"(11) That no log hauling work was permitted or performed on Saturday, Sunday or Holidays, as McDonough operated on a 40-hour, 5-day week, 8-hour day, all under the terms of a union contract.

"(12) Plaintiff was required to and did take his turn at having his truck loaded with logs along with other truck drivers similarly situated.

"(13) The loading of the trucks was under the exclusive jurisdiction and control of the head loader, an employee of McDonough.

"(14) The head loader was responsible to properly load said trucks in accordance with the Logging Safety Code and other provisions of law respecting such matters.

"(15) That the things that the head loader was required to and did see were done in compliance with the Logging Safety Code requirements were:

"(1) That no trucks were moved until all men were in the clear and that no work was being performed on trucks that were in motion;

"(2) That no one stood directly behind a truck while a log was being loaded;

"(3) That trucks required to back into the loading place did so only on his authorized order and under his direction;

"(4) That no logs were landed at said donkey landing while cars or trucks were being spotted;

"(5) That in unloading trailers from motor trucks with hooks or tongs that the trailers were hoisted clear of the truck, driven to a safe distance, and the trailer then lowered to within one (1) foot of the ground, all before workmen were permitted to approach the trailer or reach;

"(6) To see that substantial links, chains or straps fastened to the truck frame were used in hoisting the trailers;

"(7) That in loading logs, that care was taken to properly balance the load on the center-plates of the truck and trailers;

"(8) That the logs loaded on the truck were well saddled, without crowding, so that there would be no excessive strain on the binder or bunk chains;

"(9) That bunk blocks did not extend beyond the end of the bunk;

"(10) That loaded logs had no projecting large knots, limbs or slabs and that loaded logs did not interfere with the operation of the hand brakes on the trucks;

"(11) That logs on the truck were loaded so that not more than one-third of the weight of the log extended beyond the trailer bunk;

"(12) That no logs were lowered on the truck while workmen were adjusting the bunk blocks or not in the clear;

"(13) To determine whether tongs, hooks or straps were to be used in loading the logs;

"(14) That all loading work was safely performed and that all loading equipment was in proper, safe condition and safely operated;

52

"(16) Plaintiff was required to haul such logs as were placed on his truck and semi-trailer, both as to amount and type of logs, and to take them to the place directed by said head loader.

"(17) When Plaintiff's turn came to have his truck loaded, the head loader would direct him where to place his truck so that it could be properly loaded.

"(18) The matter of loading was substantially as follows: The head loader signalled the loading engineer to lift the semi-trailer off the truck of the plaintiff to the ground, where members of the loading crew, all employees of McDonough, coupled the trailer to the truck. The head loader directed the spotting of the truck so that it could be loaded, the plaintiff remaining in his truck and operating it as directed, after which plaintiff coupled the air brakes. The loader then selected the logs to be hauled and saw that they were properly placed in accordance with the requirements of the Logging Safety Code and other laws applicable thereto.

"(19) After the logs were loaded they were scaled by the head loader, who gave the truck driver a slip showing his scale and who instructed the driver where the logs were to be delivered, which directions plaintiff was bound to follow.

* * * * *

"(21) The head loader, in performing his duties, loaded each truck as the logs were available, showing no favoritism as between the several truck drivers.

"(22) No truck driver was allowed to select the particular logs he would like to have on his truck, nor to select the particular destination to which said logs were to be delivered.

"(23) After the loading was completed and the scaling done, the truck driver put on his binder chain and drove his truck to the delivery destination point.

"(24) Arriving at the destination point, the

logs were unloaded by others under arrangement between McDonough and the purchaser of the logs.

"(25) Logs delivered to the Mohler re-load were to be unloaded by persons with whom McDonough had made arrangements to do the unloading work.

"(26) Plaintiff could not, under the terms of his agreement, load his truck and haul logs before the loading crew reported to work or after they had quit or when they were not present, as on Saturdays, Sundays and holidays.

"(27) Plaintiff had the right to quit at any time and McDonough had the right to terminate his services at any time without any reason or excuse and without incurring any legal liability to the other.

"(28) Plaintiff was under no duty or obligation to haul any certain amount of logs during any certain time nor was McDonough obligated to plaintiff to furnish him any certain or fixed amount of logs to haul for any certain or fixed period.

"(29) Plaintiff was to be paid for such hauling at so much per thousand feet haul and was not to be paid any fixed lump sum for any given amount of logs.

"(30) When plaintiff's trucks and the trucks of other drivers similarly situated became mired in the mud before reaching the hard-surfaced state highway, they were pulled out of the mire by equipment owned and operated by McDonough without charge being made therefor to the truck drivers and without any reduction in the sums due and owing said truck drivers for the hauling of said load.

\* \* \* \* \*

"(32) Between the place of unloading and the place of delivery, McDonough had the right to stop him while enroute and to change the place of delivery, adjustments in pay to be made accordingly.

"(33) Bowser, by his agreement with McDonough, was required to haul exclusively for McDonough, which he did from the day he started to work until the date of his injury.

"(34) That McDonough, through his right to discharge truck drivers, had the right to change the destination of delivery after the trip had started and the right of control over the methods and means used by the truck driver as to how he performed his work.

"(35) That hauling of logs was an essential and integrated part of the whole operation of logging."

With these facts before us, let us ask the question: Did the company have the right to control the services of respondent? It is almost necessary to consider, in connection with this primary test, one of the secondary tests, namely, the right to terminate the relationship. The author of the note in 120 A. L. R. at page 1046 says:

"In the later cases, as well as those cited in the earlier annotations, the right of either party to terminate the relation without incurring liability to the other has been regarded as strong evidence that the contract was one of employment merely, and that the truckman or teamster was not an independent contractor."

See also Schneider, supra, at page 167.

It will be noted that the trial court found that respondent had the right to quit at any time and that the company had the right to terminate his services at any time, without any liability on the part of one to the other.

In *Burruss v. B. M. C. Logging Co.*, 38 N. M. 254, 31 P. (2d) 263, the court, in discussing this particular

phase of such a relationship as here involved, said, among other things:

"In this particular case, the fatal fact, as we see it, is that found at appellee's request, that appellant logging company 'retained the right to employ and discharge the deceased at its will.' * * *

"The relation placed complete *power* of control in the logging company. Its free exercise could not have been resisted nor redressed in damages if it went to the limit of ending the relation. Wherein is there legal distinction between this *power* to control and the *right* to control which counsel agree is the test?

"To put the matter somewhat differently, the independence of control of the special findings is imaginary. In so far as there was an express contract, it was merely to 'put on' the deceased at log hauling at so much per thousand feet. The claimed independence of control is merely the custom of the woods known to both parties, and hence invoked as a part of the contract. We need not question that these known customs would have entered into a contract with some duration, fixed by time or result. We cannot see how they can form a part of this contract. All independence must end at a word from the employer. It is a matter of sufferance, not of right. The findings really show failure to exercise control, not lack of right.

"And so the test invoked by appellants fails to sustain their position. The contract giving the deceased no freedom from control, he is no less an employee or servant because of the independence he actually enjoyed.

"Among the numerous decisions cited by appellants, all of which have had consideration, there are some that have resolved the question differently than we do, overlooking or disavowing the decisive effect of the power of instant discharge without legal liability. We have never seen it denied that this feature was one for consideration, and it has

been many times found controlling in cases more or less similar to this. A number of such decisions are cited in Re James Murray, 130 Me. 181, 154 A. 352, 75 A. L. R. 720. Such we think was the real basis of decision in the much-cited case, Tuttle v. Embury-Martin Lumber Company, 192 Mich. 385, 158 N. W. 875, Ann. Cas. 1918C, 664. See, also, Press Publishing Co. v. Industrial Accident Commission, 190 Cal. 114, 210 P. 820; Thompson v. Twiss, 90 Conn. 444, 97 A. 328, L. R. A. 1916E, 506.''

We think this reasoning is sound. Here both parties have the right to terminate the relationship without any liability whatever. Here if respondent did not perform every part of his operation to the exact liking of the company, the company could say: "You're through.'' The effect of that power possessed by the company required respondent to conduct his operations at all times as it might please the logging company and its manager. True, respondent had the right to discontinue log hauling at any time without any liability therefore. This likewise smacks of employment rather than a contract of substance.

The effect of giving the company this right was to require respondent to do precisely what he was told to do. His only hope of success was to comply with the company's every will and pleasure. It was an economic necessity. He had nothing to say about the hours he worked or the days he worked. He could not come and go as he saw fit. He had to take his turn. The loading of his truck was entirely under the control of the head loader, an employee of the company. The loader determined the length, size and condition of the load.

As illustrative of the effect of the right to discharge or terminate without liability, an incident is

related by respondent where he was so overloaded that he lost the greater part of a day in order to avoid the state police. In fact, at the time of the injury, he was unloading a load containing 7,200 feet. When his time came to load "the head loader signalled the loading engineer to lift the semi-trailer off the truck of the plaintiff to the ground, where members of the loading crew, all employees of McDonough, coupled the trailer to the truck so that it could be loaded, the plaintiff remaining in his truck and operating it as directed, after which plaintiff coupled the air brakes. The loader then selected the logs to be hauled and saw that they were properly placed in accordance with the requirements of the Logging Safety Code and other laws applicable thereto." It is argued that all of this is in accordance with the "custom of the woods." It is also evidence of control by the company.

If respondent mired down or couldn't pull the hill, the company "Cat" was sent to render assistance without charge to respondent. In fact, on the day of the injury, respondent left the "landing" or "loading point" about 1:00 o'clock, travelled about two miles to a hill where, because of a shower making the road slippery, and because of the size of his load, he was unable to make the hill, whereupon he sat beside the road and waited until 4:30 for the company to send the "Cat" to "push him over the hill."

He had nothing to do with unloading the logs unless he was late, in which case he secured assistance and unloaded. This he was doing when injured.

A careful analysis of the operation involved causes one to inquire: Just what did respondent do without being instructed with reference thereto? He kept his truck in running condition. He drove it from the load-

ing point to the place of delivery unless he mired in the road or couldn't pull the hill, or unless he was stopped en route and his place of delivery changed. So far as we can learn from the findings and the record, no one instructed or assisted him in his return from the point of delivery to the "loading point." It will be observed from the foregoing that the company, by and on account of its right to terminate the relationship, not only had the right to control, but, to a very great extent, did control respondent's operation.

To illustrate, we take an excerpt from the testimony of McDonough himself, with reference to loading:

"Q Then after he has done that what does the truck driver do?

"A Well, most of them get in their cab. Lots of them don't get in their cab. Lots of them get out there and try to tell you which load they want. If the head loader is any kind of a loader he tells them which load to take.

"Q In fact, he practically always tells them what load they are going to take, whether they like it or not?

"A Well, in cases he does it."

This all strongly tends to establish the relationship of employer and employee.

With reference to this matter, it is aptly stated by the trial court:

"In the instant case, there is no difference at all between Bowser's actual situation in so far as control is concerned and the situation of one hired to drive a logging truck and trailer owned and operated by the logging company. The only difference between the two situations lies in the fact that here, as a part of his contract of hire, Bowser undertook to furnish his own equipment."

For cases holding that furnishing of such equipment does not prevent a driver from being an employee, see 120 A. L. R. 1055 and 43 A. L. R. 1318.

■ We will now give consideration to some of the remaining secondary tests of the relationship between these parties. We have already considered (a) the right to terminate the relationship.

(b) Nature of work contracted for. The author of the note, 120 A. L. R. 1031, at page 1047, makes this statement:

"Later decisions, as well as those cited in the earlier annotations, support the propositions that the fact that a truckman or teamster is engaged in the performance of a specific piece of work is ordinarily held to be strong evidence that he is an independent contractor; conversely, where the contract does not call for the performance of a specific piece of work, the relationship of employer and employee is indicated."

Certainly no one could contend that, under the findings made by the trial court, respondent contracted to do any definite or specific piece of work. Therefore, applying this test to the findings before us, we find that it points to the relationship of employer and employee.

■ (c) Right of truckman or teamster to employ substitutes or assistants. The author of the note in 120 A. L. R. 1048 states the rule thus:

"The right of a teamster or a truckman to employ helpers or assistants is strong evidence that he is an independent contractor, but it is not conclusive of such status."

There is no finding upon this question.

(d) Mode of making compensation. The author

of the note referred to makes this statement at page 1049:

"That a truckman or teamster receives wages based upon the time employed rather than the amount of work he accomplishes is strong evidence that he is an employee."

In this case, the record shows that respondent was paid by the thousand.

Schneider, in his Workmen's Compensation Text, supra, at page 168, says:

"While the status of a truckman or teamster as an employee seems clear when payment is by the hour, day, week or month, and indefinite as to time of employment, there is a wide difference of opinion as to his status when payment is by the piece or quantity method.

"Some courts hold such a basis of payment indicative of an independent contractor; while others regard it as a method of determining wages, and therefore indicative of an employee relationship."

The cases cited by the author sustaining the independent contract theory are from Georgia, Kentucky, Louisiana, Massachusetts, Minnesota, Missouri, Nebraska, Ohio, Oklahoma, Texas and Utah. See note 11. The cases sustaining the employer-employee relationship are from Arkansas, Louisiana, Michigan, Minnesota, Nebraska, New Mexico, Tennessee, Texas, Virginia and Wisconsin. See note 12.

It will be noted that the authorities are very evenly divided, some states, according to the author, holding both ways. If we were required to determine this question from the standpoint of this test alone, we would consider it necessary to analyze these cases; but, inasmuch as this test is not controlling and there

is much evidence applicable to other tests, we shall pass to consideration thereof.

(e) Furnishing and maintaining trucks, teams, tools, etc. The author of the note in 120 A. L. R. makes this statement at page 1053 regarding this matter:

"Though not conclusive evidence, it seems that ownership of a truck or team by the teamster or truckman using them is some evidence of an independent contractorship. Many cases, though holding such a one an employee, recognize the fact that such ownership points to the contrary."

In this case the findings clearly sustain the proposition that respondent is the owner of his truck and that he maintained it in running condition; and we would therefore say that, viewed from the standpoint of this test, the evidence strongly tends to indicate the relationship of independent contractor.

(f) Former relationship between the parties. There is no evidence upon this question, nor is there any finding with reference thereto; therefore, we pass any consideration thereof.

(g) Rendition of services for others. Again, we have this statement from the author of 120 A. L. R. at 1055:

"That a truckman or teamster performs services for others is a circumstance indicative of an independent contract, but it is not conclusive."

Later the author of this note adds:

"And, conversely, one of the considerations influencing the court in Burchett v. Department of Labor & Industries (1927) 146 Wash. 85, 261 P. 802, 263 P. 746, supra, II b, in declaring one to be an employee, was the fact that he might not haul logs for others."

See also Schneider, Workmen's Compensation Text, *supra*, at page 172.

There is a sharp conflict in the evidence upon this question. The trial court found, and there is ample evidence to sustain his finding that "Bowser, by his agreement with McDonough, was required to haul exclusively for McDonough, which he did from the day he started to work until the date of his injury."

Whatever benefit we derive from applying this test, whether it be great or small, in view of this finding, tends to sustain the relationship of employer and employee.

One other circumstance not covered by the findings and which points to the relationship of employer and employee rather than that of an independent contractor will now be referred to. That has to do with the manner and method of establishing this relationship. McDonough himself testified, when asked regarding the manner in which he entered into these contracts with his log haulers or how he employed them, as one may choose to state it, as follows:

"A * * * Supposing I needed two trucks to-morrow morning, and you was the owner of one of them, and that man sitting there was the owner of the other one. Maybe I would go to you and I would say, 'Well, I need two trucks. Would you come and haul for me?' Well, you would say, 'Well, this man here has got a truck. He isn't working. Maybe he would like to haul.' 'All right. Well, you go to see that guy, and you come out to my landing the next morning, both of you.' But the first thing, before you would come, you would ask me how much a thousand I was paying on these particular hauls. If you figured it was a fair price you would come; if you didn't figure it was a fair price you wouldn't come, because a truck driver—if you

was owning that truck you would want to make as much as you could, and that is where you would go and haul, if you had a chance to haul.

"Q Now, what you have just gotten through telling us, that is what we have been calling the contract you had with the plaintiff in this case; isn't that correct?

"A That is right; that is right."

This testimony smacks strongly of the hiring of an employee rather than the making of an independent contract to do a specific piece of work.

■ From the foregoing it appears that the logging company not only had the right and power to control the operation, but to a great degree actually exercised that right; that it had a right to terminate the relationship at will without liability; that the nature of the work was such that respondent was not required to do a specific piece of work, but only such as the company could provide from day to day when it wanted to operate; that the mode of making compensation (by the thousand) could as well be considered wages as returns from a contract; and that respondent rendered services exclusively for the company—all these circumstances point to the relationship of employer and employee. As against this, the only fact pointing in the other direction is the ownership and maintenance of the truck and semi-trailer by respondent. As the cases point out, that is not conclusive.

We have already referred to and quoted from *Burress v. B. M. C. Logging Company*, supra, a case strikingly similar to the one presented here. We shall now make reference to two other cases likewise strikingly similar to the case at bar, from our sister states of Washington and Idaho.

In *Burchett v. Department of Labor and Industry*,

146 Wash. 85, 261 P. 802, 263 P. 746, the claimant entered into a contract with the logging company to haul logs, furnishing his own truck and gasoline and his own services. He was to be compensated therefor at the rate of $4 per thousand. No definite quantity of logs was specified. He was free to quit at any time, and the logging company was free to discharge him at will. From the time of its commencement, the work was continuous, claimant working until he was hurt and hauling for no other person. Claimant hauled only the logs which were loaded upon his truck by other employees of the logging company. In other words, he was not permitted to haul other logs. He unloaded at the place designated by the company. He was required to report at a certain time of the morning when other employees of the company were at hand to load his truck. The court held that the relation of employer and employee was established and not that of independent contractor.

In *Hiebert v. Howell*, 50 Idaho 591, 85 P. (2d) 699, 120 A. L. R. 388, the operator had the right to discharge the claimant, and the claimant had the right to quit at any time without breaking the contract. The claimant was required to go at a definite hour in the morning. The operator could change the claimant from one place to another on different jobs according to how the loading worked out. Claimant did not have a contract to haul any specified amount of logs. He worked subject to the orders of the operator as to time, place and manner of loading, and delivered where directed. The court said:

> "Except for the fact that they furnished their own trucks and hauling equipment and boarded themselves, and used the bunks in Howell's bunkhouse, they were the same as any other ordinary employee."

We hold herein that the evidence supports the findings and that the findings support the conclusion that the respondent, Ed C. Bowser, was an employee of McDonough Logging Company at the time he received his injuries. It follows from the foregoing that the judgment of the trial court should be and is hereby affirmed.

■ A request has been made for additional attorney's fees in the sum of $250 for the preparation and prosecution of this appeal on behalf of respondent. Chapter 303, Oregon Laws 1945, provides, among other things, as follows:

" * * * Appeals may be taken from the judgment of the circuit court as in other cases, and in case of an appeal by the commission from an adverse decision of the circuit court if the judgment of the circuit court is affirmed, the claimant shall be allowed attorneys fees, to be fixed by the court, in addition to the compensation."

The brief filed on behalf of respondent shows that counsel for respondent has given the subject careful and painstaking attention and that all points involved have been thoroughly covered. Under all the circumstances, the amount requested is not excessive; and it is, therefore, hereby ordered and adjudged that additional attorney's fees be and the same are hereby allowed to respondent in the sum of $250.

Rossman, C. J., dissents.