Argued May 7, affirmed November 6, 1963

## WALLOWA VALLEY STAGES, INC. *v.* THE OREGONIAN PUBLISHING COMPANY

386 P. 2d 430

*Carl G. Helm, Jr.,* La Grande, argued the cause for appellant. With him on the briefs were Helm & Neely, La Grande.

*R. Thomas Gooding,* La Grande, argued the cause for respondent. On the brief were Burleigh, Carey & Gooding, La Grande.

Before McALLISTER, Chief Justice, and ROSSMAN, PERRY, SLOAN, O'CONNELL, GOODWIN and DENECKE, Justices.

GOODWIN, J.

The Oregonian Publishing Company appeals from a judgment upon a jury verdict for the plaintiff.

The question is whether The Oregonian's legal relationship with its codefendant Badgett was such that The Oregonian should be liable on a theory of *respondeat superior* for damages resulting from a collision between Badgett's automobile and the plaintiff's bus. The jury found Badgett negligent. He has not appealed.

At the time of the collision Badgett was on his way from Enterprise to obtain newspapers from a distribution point The Oregonian maintained in La Grande. It was Badgett's duty, in order to perform his contract with The Oregonian, to drop bundles of newspapers at designated points along State Highway 82. He had other duties, which included collecting accounts, hiring and firing delivery boys, and soliciting new subscribers. His Oregonian route did not occupy all his working hours; he also distributed a Walla Walla newspaper and certain magazines. Badgett furnished his own automobile and paid the expenses thereof.

The written contract between The Oregonian and

Badgett is called an "Independent Dealer's Franchise." The Oregonian relies, *inter alia,* upon the contract to insulate it from liability arising from any negligent conduct by Badgett while performing his duties.[①] Similar contracts have been deemed significant, although usually not controlling, elsewhere. See, e.g., *Batt v. San Diego Sun Pub. Co., Ltd.,* 21 Cal App2d 429, 69 P2d 216 (1937); *Bohanon v. James McClatchy Publ. Co.,* 16 Cal App2d 188, 60 P2d 510 (1936); *Gall v. Detroit Journal Co.,* 191 Mich 405, 158 NW 36, 19 ALR 1164 (1916); *Bass v. Kansas City Journal Post Co.,* 347 Mo 681, 148 SW2d 548 (1941). See also cases collected in Annotation, 53 ALR2d 183, 186 (1957).

---

[①] "* * * * *

"3. The Dealer will pay the Company for all newspapers furnished at the prevailing wholesale prices from time to time fixed by the Company, such payment to be made by the Dealer promptly upon receipt from the Company of a statement of account and in no event later than the fifteenth of each month, provided, always, that upon termination of this agreement, all moneys owing by the Dealer to the Company shall be immediately due and payable.

"4. The Dealer shall conduct his business in the course of which he causes said newspapers to be distributed, without the aid, advice or supervision of the Company or the Company's employees, and according to the Dealer's own means and methods, without control, direct or indirect, by the Company, and in such manner as not to impose liability on the Company for any act or omission of the Dealer or his subordinates.

"5. Retail and wholesale prices of said newspapers shall be at the rates from time to time established by the Company, and subscriptions to said newspaper shall be taken at the retail rates to subscribers from time to time established by the Company.

"* * * * *

"11. The Company may forthwith terminate this agreement or suspend performance hereunder without notice in the event the Company's plant or business is subjected to a strike or other * * * [delay in publication], or in the event the bond or security furnished by the Dealer becomes valueless, or decreases in value to such extent that it fails to afford the Company adequate protection, or in the event of any breach of this agreement by the Dealer. In any event, either party may terminate this agreement upon giving the other party thirty (30) days' written notice of intention to terminate.

"* * * * *."

In addition to considering any contractual arrangements, courts also look to the actual conduct of the business. See, e.g., *Great American Indemnity Co. v. Fleniken,* 134 F2d 208 (5th Cir), cert. den. 319 US 753, 63 S Ct 1167, 87 L Ed 1706 (1943). Where conduct of the parties is inconsistent with their written contract which purports to insulate the employer from liability, the conduct controls. *Sanford v. Goodridge,* 234 Iowa 1036, 13 NW2d 40 (1944).

In cases decided under statutory schemes, newspaper circulation personnel are sometimes treated as employes, at least for such purposes as social security, workmen's compensation, and collective bargaining. In cases brought under such legislation, the purposes behind the particular statute are given primary consideration in determining whether one engaged in work for another should be treated as an employe or an independent contractor. See, e.g., *Bowser v. State Indus. Accident Comm.,* 182 Or 42, 185 P2d 891 (1947); *Journal Pub. Co. v. State U. C. Com.,* 175 Or 627, 155 P2d 570 (1945); *Board v. Hearst Publications,* 322 US 111, 125, 126, 64 S Ct 851, 88 L Ed 1170 (1944); Wolfe, *Determination of Employer-Employee Relationships in Social Legislation,* 41 Colum L Rev 1015 (1941).

In such cases, the tests of "control" or "right to control" are deemed to be of only slight, if any, relevance. But see *Nordling v. Johnston,* 205 Or 315, 283 P2d 994, 287 P2d 420, 48 ALR2d 1369 (1955), noted 37 Or L Rev 88 (1957), where the "right to interfere" was enough to make the question one for the jury. Where legislation is concerned, persons engaged in a given activity generally are deemed to be employes whenever it is found to be consistent with legislative objectives that they be so regarded. Likewise, they may be

treated as independent contractors whenever legislative or other policy considerations make that choice the more reasonable in a given case.

In tort cases, however, the right of the employer to control the workman is the basis most commonly advanced for imposing liability upon the employer. A total lack of control, especially when accompanied by other manifestations of independence, tends to militate against liability. Where the employer has no right to control his actions, the actor is usually deemed to be an independent contractor. See *Clark v. Shea et al,* 130 Or 195, 279 P 539 (1929); 2 Harper & James, Torts 1366, §§ 26.3-26.11 (1956); and cases collected in the Annotation, 53 ALR2d 183 (1957).

Many of the tests used by courts in determining whether a particular person is a servant or an independent contractor have been distilled into the definition of a servant found in Restatement, 1 Agency2d § 220 at 485-486 (1958):

"Definition of Servant

"(1) A servant is a person employed to perform services in the affairs of another and who with respect to the physical conduct in the performance of the services is subject to the other's control or right to control.

"(2) In determining whether one acting for another is a servant or an independent contractor, the following matters of fact, among others, are considered:

"(a) the extent of control which, by the agreement, the master may exercise over the details of the work;

"(b) whether or not the one employed is engaged in a distinct occupation or business;

"(c) the kind of occupation, with reference to whether, in the locality, the work is usually

done under the direction of the employer or by a specialist without supervision;

"(d) the skill required in the particular occupation;

"(e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work;

"(f) the length of time for which the person is employed;

"(g) the method of payment, whether by the time or by the job;

"(h) whether or not the work is a part of the regular business of the employer;

"(i) whether or not the parties believe they are creating the relation of master and servant; and

"(j) whether the principal is or is not in business."

If the foregoing considerations are used in the trial of jury cases, the trial court ultimately has to tell the jurors, at least in a general way, how to apply to the case at hand their affirmative or negative answers to the Restatement tests. They must arrive at a general verdict based upon their decision that the actor in a given case was, or was not, a servant. Thus, the trial courts understandably rely strongly upon the element of control, or the right to control, and in their instructions relate to the general concept of control such other suggestions, like those found in § 220 of the Restatement, as they may see fit to use. Frequently the summarizing instruction is phrased in language like this:

"* * * An independent contractor is one who carries on an independent profession, business or trade and who contracts to serve his employer's desires only as to the result to be accomplished— not as to the details of method whereby that result

is to be obtained. The decisive test of the relationship is: Who has the right to direct what shall be done, and when and how it shall be done? * * *"
1 California Jury Instructions 147, No. 54-F (4th rev ed, William Palmer, 1956).

The Oregonian does not complain of a similar instruction given below, but rather contends that the question should not have gone to the jury at all.

■ The trial court in the case at bar deemed the evidence sufficiently controversial to make a question for the jury. Analytically, this practice may not always lend itself to a fastidious application of the rule that the jury decides fact and the court decides law. Whether or not a given person is the servant or the contractor of another is ordinarily a question of law, where the facts are clear. Where the facts are in dispute, however, it becomes necessary to submit at least the questions of fact to the jury. If more than one inference may be drawn from the facts, the jury makes the selection in arriving at a general verdict. See, e.g., *Kowaleski v. Kowaleski,* 235 Or 454, 385 P2d 611 (1963); *Fleming v. Ambulance Co.,* 155 Or 351, 362, 62 P2d 1331, 64 P2d 519 (1937); *Roemhild v. Home Ins. Co. et al,* 130 Or 50, 278 P 87 (1929). If special interrogatories are employed, under ORS 17.415, the court would have to decide whether the answers were consistent with the general verdict. See *Whelpley v. Frye, Adm'x,* 199 Or 530, 263 P2d 295 (1953).

Whenever the trial court concludes in a preliminary way that the case should go to the jury for a general verdict, the trial court has in effect concluded as a matter of law that the questioned relationship was at least arguably that of master and servant.

In other words, the court necessarily has decided in such a case that the jury is free to impose liability. Thus, the trial court obliquely rules in such cases that the case falls within that class of cases to which the doctrine of *respondeat superior can apply.* See, on elasticity in the matter of liability under the general verdict system, Traynor, *Fact and Skepticism and the Judicial Process,* 106 U Pa L Rev 635, 639, 640 (1958).

■ There is no basis for reversal in the case at bar unless this court can say as a matter of law that Badgett was an independent contractor. The ultimate legal question in this case is whether the particular facts, viewed most favorably for the plaintiff, bring the relationship of Badgett and The Oregonian within the allowable range in which a jury can say that the master-and-servant relationship existed. The jury could have found that The Oregonian gave Badgett general directions with reference to methods and results to be obtained. The jury likewise could have found that The Oregonian indirectly exercised some control over the detail of Badgett's operations. The evidence that supervisory personnel from the newspaper's circulation department made frequent visits to Badgett permitted the jury to infer that these visits were related to Badgett's methods of operation.

The written contract required Badgett to furnish the publisher with lists of all subscribers served by Badgett, and gave the publisher the ownership of such lists. The contract also gave the publisher the right to terminate the relationship on thirty days' written notice with or without cause. Accordingly, if Badgett wanted to keep his "franchise", he would have to deliver the papers to the satisfaction of the publisher. While Badgett testified that he was self-employed and that he received no directions concerning the manner

in which he was to do his work, his testimony contained ambiguities if not contradictions.

He said, for example, that the circulation supervisors did not tell him he had to have his papers delivered by a certain time, but rather that "you could hold business better if you would have the papers out by six o'clock in the morning." He testified that supervisory personnel from the circulation department rode with him and showed him how to solicit customers. He denied that they gave him specific directions in other matters. Whether the supervisors gave Badgett suggestions or instructions was a matter the jury was entitled to decide based upon its consideration of all the evidence.

The jury was not bound to take the wholesale-retail language of the written contract at face value. It was entitled to look beyond the written instrument and draw from the evidence its own inferences concerning the behavior of the parties. The jury was likewise entitled to draw upon common knowledge and experience in evaluating the testimony. It could, for example, take into consideration the publisher's interest in cultivating the circulation of its newspaper as a valuable asset to sell to advertisers. Thus the jury could infer that the reason Badgett was frequently visited by circulation representatives was because the newspaper management was exercising some degree of control over the distribution of the papers to the subscribers. We do not hold that the amount of supervision exercised in the case at bar was sufficient to constitute Badgett an employe as a matter of law. Neither can we hold that Badgett was an independent contractor as a matter of law. We hold that there was evidence from which the jury could draw its own inferences on the matter.

The law generally contains no policy against the subcontracting of all or part of the operations of an industry to independent parties. Whether such contractors are financially able to protect the public from losses caused by their negligence is, theoretically at least, a matter of indifference, if they are truly independent. Where, however, an enterprise in an integral part of its operation makes regular use of the services of individuals over whom it reserves absolute economic control, i.e., the right to hire and fire virtually at will, a jury can find that such service personnel are subordinates. See *Fleming v. Ambulance Co.,* 155 Or at 360, and authorities cited. This is so even though between the parties the persons performing the services are characterized as contractors.

While The Oregonian has placed some reliance upon the fact that Badgett owned and operated his own automobile, and upon the fact that he delivered periodicals for other publishers from time to time in connection with, and incidental to, the delivery of newspapers for The Oregonian, these facts were considered by the trial court and by the jury, and were found to be insufficient to overcome other evidence tending to place Badgett in a subordinate role under the practical control of the circulation department of The Oregonian.

We hold that there was no error in overruling The Oregonian's several motions⑧ which would have eliminated The Oregonian as one of the defendants.

---

⑧ The plaintiff had also alleged in a separate cause of action that The Oregonian negligently employed an incompetent driver, but this issue was withdrawn from the jury and was not preserved on appeal. This cause of action was based on negligence rather than on vicarious liability, and, if before us, would present completely different problems.

The other assignments of error challenge various instructions. With reference to the contributory negligence of the plaintiff, we are satisfied that the matter was for the jury and was properly submitted.

With reference to the various instructions concerning the specific acts of negligence charged to the defendant Badgett, there was testimony to support the submission of the specifications of negligence which went to the jury.

The evidence concerning the measure of damages likewise presented a question for the jury. There was some evidence that the plaintiff could have realized certain salvage values, the exact amounts of which were not placed before the jury. This did not make the verdict so speculative that it must be set aside as without foundation in the proof.

We have given careful consideration to the various assignments of error and have found none that discloses a basis for reversal.

Affirmed.

PERRY, J., dissenting.

I am unable to agree with the majority since, in my opinion, there is no substantial evidence in the record that the publishing company had the right to exercise control over the manner in which the defendant Badgett controlled and operated his newspaper delivery business.

In my opinion the posture of the case is such that the jury is left to speculate as to what may or may not be the relationship between the publishing company and Badgett. The publishing company was entitled to an instruction as a matter of law that there was a

failure of proof on the part of the plaintiff to establish that defendant Badgett was an agent of the company.

I would reverse.

Mr. Justice ROSSMAN concurs in this dissent.