HECTOR v. CADILLAC PLUMBING & HEATING CO.

1. MASTER AND SERVANT—WORKMEN'S COMPENSATION ACT—FINDINGS OF DEPARTMENT CONCLUSIVE IF BASED ON COMPETENT EVIDENCE.

In reviewing by certiorari proceedings under the workmen's compensation act, the findings of the department of labor and industry will not be disturbed if there is any competent evidence upon which they are based.

2. SAME—FINDING THAT RELATION OF MASTER AND SERVANT EXISTED SUPPORTED BY EVIDENCE.

Evidence that a drayman, who owned his own truck, was hired by a plumbing company to transport to a neighboring city a load of materials and tools, that the company

On who are employees within the meaning of the workmen's compensation statute in general, see notes in L. R. A. 1916A, 115; 246; L. R. A. 1917D, 145; L. R. A. 1918F, 179.

told him which route to take and the speed at which he should drive, that it ordered him to report to it on his return, and that there was no compensation agreed upon for the trip, together with the action of the company in its report to the department of labor and industry of an accident in which he was killed on the return trip classifying him as an employee, *held*, to justify a finding by the department of labor and industry that he was an employee within the meaning of the workmen's compensation act.   CLARK, C. J., and BIRD and WIEST, JJ., dissenting.

Certiorari to Department of Labor and Industry. Submitted January 10, 1924.   (Docket No. 46.)   Decided April 10, 1924.

Ella Hector and others presented their claim for compensation against the Cadillac Plumbing & Heating Company for the accidental death of their decedent in defendant's employ.   From an order awarding compensation, defendant and the State Accident Fund, insurer, bring certiorari.   Affirmed.

*Kerr, Lacey & Scroggie,* for appellants.

*A. W. Penny,* for appellees.

MOORE, J.   This is certiorari to the department of labor and industry, by which it is sought to review its action in allowing to the applicants, who are the widow and children of Otto Hector, deceased, the sum of $14 a week for a period of 300 weeks.

The claim of the appellants is:

"This case is one which involves a question as to whether or not Otto W. Hector was an employee of the Cadillac Plumbing & Heating Company. If he were not an employee, was he an employee of a subcontractor or contractor with whom the Cadillac Plumbing & Heating Company had contracted, which subcontractor or contractor had not accepted the Michigan workmen's compensation law, or was he an independent con-

226—Mich.—32.

tractor. If he were an independent contractor, there can be no liability. If he be not an employee of a contractor or a subcontractor who had not accepted the terms of the compensation law, there can be no liability. If he were an employee of the Cadillac Plumbing & Heating Company, the award of the department of labor and industry should be affirmed."

In the return to the writ is the following:

"The Cadillac Plumbing & Heating Company, the respondent employer, is engaged in the plumbing, heating and sheet metal business in the city of Cadillac. It does work of that nature in neighboring communities. On January 2, 1923, it was doing work at Reed City and desired to transfer a load of material and tools from Cadillac to Reed City. It arranged with Otto Hector to transfer the material and tools. Hector owned a Ford truck and did jobs of trucking. The arrangement with Hector was made by E. J. Morgan, president of the company. Morgan sent Hector to the warehouse of another company after the material where L. J. Deming assisted in loading the truck. He was also sent to another part of the city after tools. A part of the load consisted of louvers, which are delicately constructed and easily bent.

"It appears that there are two roads leading to Reed City and the respondent's officials directed Hector to take the north and longer route because of the condition of the roads. It also directed him to drive carefully because the louvers were easily damaged and directed him to secure the janitor at Reed City to help unload. It also directed him to return to Cadillac and report. No arrangements were made as to the compensation which Hector was to receive. Hector took the load to Reed City and while returning was killed when his truck was struck by a train in the vicinity of Leroy.

"The only question in the case is whether Hector was an employee within the meaning of the law. It is conceded that the claimants, his widow and two daughters, were total dependents.

"On the day following the accident, the Cadillac Plumbing & Heating Company made out a 'report of compensable accident' which it subsequently mailed to this commission. In this report the company listed

Hector as an employee.   On January 10th the Cadillac Plumbing & Heating Company made out a 'supplemental report of fatal accident' in which it listed Hector as an employee, and listed his wife and two daughters as total dependents.   This report was also filed with this commission.

"At the arbitration, E. J. Morgan, president of the heating company, was called as a witness.   He testified:

" '*Q.* Did you have any stated sum that you paid him?

" '*A.* No, sir.

" '*Q.* How did you pay him?

" '*A.* We paid him—there was no stated sum; we paid him what we considered the trip was worth for the time taken.

" '*Q.* Did that depend on the condition of the roads and the length of time it took him to go?

" '*A.* Well, largely.

" '*Q.* And the size of his load, would that depend upon the amount you paid him?

" '*A.* Yes, sir.

" '*Q.* But you say you have no stated amount that you paid him?

" '*A.* Well, we settled that ourselves; not any charge that he ever made; that we ever paid him, he did make a charge once of $8 and that is he said it was worth $8 and we told him that that was too little.

" '*Q.* And you paid him more?

" '*A.* We paid him $10.'

"Concerning the directions given Hector, Morgan testified as follows:

" '*Q.* Did you tell him that you wanted him to go to Reed City?

" '*A.* Yes, I told him I had a load to go and I told him where to go to get it.

" '*Q.* Where did you tell him to go?

" '*A.* I told him he would have to go out to the Cadillac Metal Works Company and get some louvers and a ventilator, a large ventilator.

" '*Q.* Now these louvers, what are they?

" '*A.* They are made out of aluminum and they are little thin, louvers that go into the back of the ventilators; they are frail things.

" '*Q.* Are they a delicate arrangement? ·

"'*A.* Yes, sir, they are arranged delicately.

"'*Q.* Easily broken?

"'*A.* Well, not so easily broken, no, but they are easily bent up and if they are they would not answer the purpose at all.

"'*Q.* And you arranged with him to take these things down to Reed City?

"'*A.* Yes, sir.

"'*Q.* And you told him to go to the Cadillac Metal Parts Company and get this stuff?

"'*A.* Yes, sir.

"'*Q.* Where is it located in Cadillac?

"'*A.* It is located on 8th street on the north end of the city.

"'*Q.* About how far from your office?

"'*A.* Oh, three-fourths of a mile.

"'*Q.* And did he go and get those?

"'*A.* Yes, sir.

"'*Q.* Did he return to your office with them?

"'*A.* He did.

"'*Q.* And when he came back to your office did you have any further talk with him?

"'*A.* Yes, I told him to go to the Emerson school building and get a tool box and some tools and put them on his dray and take them with what he had on.

"'*Q.* Where was the Emerson school building?

"'*A.* It is on Stimpson street, Cadillac, southeast.

"'*Q.* And he in going from your office to Reed City would he go by the Emerson school or not?

"'*A.* No, well, he didn't that day, he could if he wished.

"'*Q.* You say you told him to go over and get some tools there, did you tell him anything else?

"'*A.* I told him to take the north road around the lake out,

"'*Q.* That is, by the lake, you mean the lake right adjacent to Cadillac here?

"'*A.* Yes, sir.

"'*Q.* And the boulevard of the city goes around the lake does it?

"'*A.* Yes, sir.

"'*Q.* And the boulevard—does the road leading to Reed City extend from the boulevard?

"'*A.* Yes, sir.

"'*Q.* You told him what, in regard to the road to take?

"'*A.* I told him to take the north road because the south road was very rough, that there was some snow drifts on the south side of the lake that would make rough traveling and that that

load, I didn't want him to do it with that load because it was a load that cost a good deal of money.

" 'Q. That is, the road on the south side of the lake would be more rough?

" 'A. Yes, sir.

" 'Q. Did you tell him that in regard to the—that is so as not to break up or bend this stuff he had on, those louvers?

" 'A. That is what I figured when I told him that.

" 'Q. Now he was at your office was he when you had this talk with him about his going on the north side of the lake?

" 'A. Yes, sir.

" 'Q. Which would have been the nearest for him to have gone?

" 'A. The south side would be the nearest.

" 'Q. How much nearer?

" 'A. Oh, I don't know, but from the schoolhouse I should say about, easily a mile nearer.

" 'Q. But he went on the north side of the lake?

" 'A. Yes, sir.

" 'Q. Did you tell him to drive?

" 'A. Why, no, except to go careful, I told him to be careful with that load, that it was stuff that cost money.

" 'Q. Did you tell him where to unload?

" 'A. Yes, I told him to put the louvers in the schoolroom and the rest outside there.

" 'Q. Anything else that he was to do, did you tell him?

" 'A. Well, not anything in particular that I know of now, only to come back and report to me that he got there all right with it because it was a bad day and I wanted to know that he got there all right because it was a bad morning.

" 'Q. Were you sending men down to that work?

" 'A. Yes, sir, on the train that hit him.

" 'Q. What was he to report back to you?

" 'A. Oh, that he had gone there and delivered his load.

" 'Q. As to the progress of the work there?

" 'A. Well, no. There was nobody there that he could get any report of that kind from.'

"Concerning the right to control Hector, Morgan testified as follows:

" 'A. What was the question?

" '*Mr. Penny:* The question, Mr. Morgan, was, did you have the right to direct and control his work?

" 'A. I would consider that I had, yes, sir, because I considered when I hired that man, that I hired him just the same as I hire a man on the corner to go down to the depot or to a store.'

"Concerning the right to discharge Hector, Morgan. testified:

"'*Mr. Penny:* Well, I will ask it in this way, suppose at any time after he got his load on that you would have wanted to discharge him, would you have done it?

"'*A.* Yes, I would feel that I did have.

"'*Q.* Now about his reaching Reed City that day, if you would have allowed him to have brought, taken a load some where else from Reed City?

"'*A.* Not under our plan of doing this work; no, sir.

"'*Q.* Because why?

"'*A.* Because he was an employee of our institution.'

"Concerning the directions which he gave Hector, L. J. Deming, secretary and treasurer, testified:

"'*Q.* Where did you see him?

"'*A.* At the Metal Parts Company.

"'*Q.* It appears that he loaded some louvers and stuff at your plant?

"'*A.* Yes, sir.

"'*Q.* Did you assist him in loading?

"'*A.* Yes, sir.

"'*Q.* Did you tell him anything in regard to his driving?

"'*A.* I assisted in loading them and tied them on the dray so they would not get damaged in going down, to be careful. I told him to go to the big schoolhouse in Reed City and get the janitor to help him to unload the louvers inside and the ventilators outside.

"'*Q.* Did you tell him how he should drive?

"'*A.* No.

"'*Q.* Whether or not he should be careful of the louvers?

"'*A.* I told him to be careful of the louvers, yes, sir, at all times as far as that does and not to get them jammed up in loading and unloading and so forth, but I didn't tell him anything special about driving, any more than, when we were loading them, I told him that they were delicate and to be careful of them.

"'*Q.* As I understand it the agreements and hiring and the like of that and the paying of Mr. Hector was done by Mr. Morgan?

"'*A.* Well, I often hire him but he was always paid by Mr. Morgan, but on that particular morning I didn't see him at all until he had come up to the plant.'

"In view of the reports filed by the respondent em-

ployer listing the deceased as an employee; the fact that no definite sum was to be paid the deceased; that he was directed where to go for his load; where to unload it; the route to follow; and to report back to the respondent employer's office in Cadillac, and the testimony of the respondent employer's president that it could have discharged the deceased at any time and that he would not have been allowed to turn the work over to a substitute, we think that the deceased was an employee and not an independent contractor."

It is the claim of the attorneys for the appellants that Mr. Hector was not an employee but was an independent contractor, and that there is no liability, citing a number of cases, but relying especially upon the cases of *Gall* v. *Detroit Journal Co.,* 191 Mich. 405 (19 A. L. R. 1164); *Tuttle* v. *Embury-Martin Lumber Co.,* 192 Mich. 385 (Ann. Cas. 1918C, 664); *Perham* v. *American Roofing Co.,* 193 Mich. 221. A reading of the opinions in those cases will show them not controlling in favor of the contention of the defendant in the instant case. The first of these cases was not one between the dependents of an employee and an employer. There was a written contract, and the employee could do the work personally or through others employed by him, and the compensation was agreed upon, and the employee might go upon any street he chose in accomplishing his results. In the second of these cases the award made was affirmed, and so far as it is applicable it sustains the award in the instant case. In the last of these cases the man who was killed was laying a roof which he had taken by the job, to be paid for at so much a square, and was not under the immediate supervision of the employer.

In the instant case the man who was killed was under the direction of his employer. There was no price for the work agreed upon, the employer regarded him as an employee and so reported to the department of labor and industry. See, as to the effect of these reports, *Reck* v. *Whittlesberger,* 181 Mich. 471

(Ann. Cas. 1916C, 771), and *Fitzgerald* v. *Lozier Motor Co.*, 187 Mich. 665.

It has been held many times that the findings of the department of labor and industry will not be disturbed if there is any competent evidence upon which to base those findings.    See *Reck* v. *Whittlesberger*, 181 Mich. 468; *Hills* v. *Blair*, 182 Mich. 26; *Estate of Beckwith* v. *Spooner*, 183 Mich. 332 (Ann. Cas. 1916E, 886); *Redfield* v. *Insurance Co.*, 183 Mich. 638.    We think there was an abundance of testimony, some of which is quoted in the return to this writ, to justify the award.

It is affirmed, with costs to the appellees.

MCDONALD, SHARPE, STEERE, and FELLOWS, JJ., concurred with MOORE, J.

WIEST, J. (*dissenting*).    The award should be set aside.

A drayman, standing for general public hire, does not become an employee under the workmen's compensation law when occasionally engaged by a company to ply his occupation in carrying articles.    The report of the accident by the company does not bar consideration of the legal question.

CLARK, C. J., and BIRD, J., concurred with WIEST, J.