SLITER v. COBB

OPINION OF THE COURT

1. MASTER AND SERVANT—INDEPENDENT CONTRACTORS—TORT LIABILITY.

The right to control determines whether the relationship between an employer and his employee is that of master and servant or employee and independent contractor, and is the test for vicarious tort liability of the employer.

2. MASTER AND SERVANT—INDEPENDENT CONTRACTORS—MOTIONS— SUMMARY JUDGMENT—ISSUE OF FACT.

The trial court did not err in determining that plaintiffs had failed to raise any issue of material fact and in granting summary judgment for defendant newspaper publisher on the ground that, as a matter of law, its deliveryman who had been in an automobile collision with plaintiffs was an independent contractor and not a servant where plaintiffs urged the following as making the deliveryman a servant and not

---

REFERENCES FOR POINTS IN HEADNOTES

[1, 4, 5] 53 Am Jur 2d, Master and Servant § 411 *et seq.*
[2] 41 Am Jur 2d, Independent Contractors § 9.
[3] 41 Am Jur 2d, Independent Contractors § 6 *et seq.*
[6] 53 Am Jur 2d, Master and Servant § 460.

an independent contractor: 1.) That the deliveryman could sell and deliver only in a mapped-out area and that when he gave up this particular territory he had to return the map to the publisher, and that he could not carry other newspapers without the written consent of the publisher; 2.) That he had to buy papers at a certain price and sell at a certain price; 3.) That he had to keep an up-to-date subscription list which was to be confidential, that the publisher would inspect it every six to eight weeks, and that it would be returned when he gave up his route, where the agreement between the publisher and the deliveryman provided that he leased the list; 4.) That he was encouraged to get new subscribers; 5.) That occasionally, three or four times during his employment, an employee of the publisher would ride with him to help him if he had trouble, that a rubber band supplied by the publisher and paid for by the deliveryman had to be placed around the newspapers, and that the newspapers had to be put in plastic tubes, furnished by the publisher and placed by the deliveryman for new customers, and removed by him when a subscription was cancelled; 6.) That the deliveryman had to do his accounting and billing on a form furnished by the publisher; 7.) That the deliveryman could cancel a subscription for nonpayment but could not cancel for other reasons without the publisher's permission; 8.) That the publisher required the deliveryman to train a replacement two weeks before he quit; 9.) That the deliveryman could not sell his route to whom he wished; 10.) That the newspaper could cancel the route at any time for good faith reasons, while the deliveryman had to give a notice of cancellation; and 11.) That the deliveryman was required to keep his vehicle in good mechanical condition.

3. MASTER AND SERVANT—INDEPENDENT CONTRACTORS—CONTROL.

A newspaper publisher's action in bringing to its deliveryman's attention that its papers had been delivered late on at least two occasions after it had received complaints from customers was not inconsistent with the deliveryman's status as an independent contractor.

4. MASTER AND SERVANT—INDEPENDENT CONTRACTORS—TORT LIABILITY—ECONOMIC REALITY TEST.

The economic reality test adopted by the Michigan Supreme Court in workmen's compensation cases will not be extended to determine tort liability of an employer to an injured third party, in the absence of any declaration by the Supreme Court that the test is applicable to tort cases.

Dɪssᴇɴᴛ ʙʏ Lᴇᴠɪɴ, J.

5. Mᴀsᴛᴇʀ ᴀɴᴅ Sᴇʀᴠᴀɴᴛ—Iɴᴅᴇᴩᴇɴᴅᴇɴᴛ Cᴏɴᴛʀᴀᴄᴛᴏʀs—Nᴇᴡsᴩᴀᴩᴇʀ Dᴇᴌɪᴠᴇʀʏᴍᴀɴ.

*A newspaper publisher is not insulated from liability for the negligent automobile driving of a man delivering its newspapers even though the deliveryman owns the delivery vehicle and purports to act as an independent contractor.*

6. Mᴀsᴛᴇʀ ᴀɴᴅ Sᴇʀᴠᴀɴᴛ—Iɴᴅᴇᴩᴇɴᴅᴇɴᴛ Cᴏɴᴛʀᴀᴄᴛᴏʀs—Mᴏᴛɪᴏɴs—Sᴜᴍᴍᴀʀʏ Jᴜᴅɢᴍᴇɴᴛ—Issᴜᴇ ᴏꜰ Fᴀᴄᴛ.

*Whether newspaper deliveryman was a servant of defendant newspaper publisher or an independent contractor was a question of fact for the jury and summary judgment for defendant was improper where the pleadings and depositions showed that the deliveryman obtained his newspaper route in response to an ad for a motor route operator which he saw in the male help-wanted section of defendant's newspaper; that the defendant owned the route and merely leased it to the deliveryman under a lease cancellable by the defendant at any time without notice for "good faith" reason; that the deliveryman, who had no other occupation, agreed not to deliver other publications besides defendant's newspaper; that the defendant paid the deliveryman $28 a week as reimbursement for the cost of operating his own automobile; that when the deliveryman experienced difficulty, which occurred a number of times, an agent of the defendant would ride with him in an effort to iron out the problem; that the delivery procedure was structured so that the deliveryman had little, if any, room for exercising independence in his work performance and hardly any individualized judgment to exercise except in the operation of his automobile; that the deliveryman could not cancel a newspaper customer except for nonpayment, without first consulting with, and receiving permission from, defendant; that the defendant determined not only the pickup and delivery times for the newspapers but also directed the manner in which the newspapers were to be rolled, banded, and deposited in roadside tubes which the defendant supplied; and that the defendant established the billing procedures, credit policies and the manner of bookkeeping.*

Appeal from Berrien, Chester J. Byrns, J. Submitted Division 3 May 5, 1971, at Grand Rapids. (Docket No. 10537.) Decided October 19, 1971. Leave to appeal granted, 386 Mich 780.

Complaint by Mary Sliter, Kermit W. Sliter, Erna Friesen, Charles Friesen, Jr., and Eleanor Krell against Marion Cobb, Ronald Lee Sims, and The Benton Harbor News Palladium, for negligent operation of a motor vehicle. Summary judgment for Benton Harbor News Palladium. Plaintiffs appeal. Affirmed.

*Cholette, Perkins & Buchanan* (by *Sherman H. Cone*), for plaintiffs.

*Carl L. Reagh,* for defendant Benton Harbor News Palladium.

Before: R. B. BURNS, P. J., and HOLBROOK and LEVIN, JJ.

HOLBROOK, J. This is an appeal by plaintiffs from the grant of a motion for summary judgment in favor of defendant-appellee, The Benton Harbor News Palladium.

In June, 1968, defendant Marion Cobb began delivering "The Benton Harbor News Palladium", a newspaper published by appellee. Defendant Cobb was designated as a "Motor Route Carrier" in the written lease agreement entered into by Cobb and appellee newspaper. On July 11, 1968, defendant Cobb invited two of his friends, defendant Ronald Lee Sims to drive and William Hauch to accompany him while he delivered that day's newspapers. This day had been chosen by Cobb to bill his customers for the month of August, 1968. It was necessary for Cobb to fill out and then insert a billing card in each newspaper. Because he filled out the cards while delivering the newspapers, it was necessary for some-

one else to drive his motor vehicle. His wife usually accompanied him on billing days; however, on this particular day his wife had gone shopping and had not returned in time to drive for him.

After delivering the newspapers to all his regular customers, Cobb proceeded to deliver some "sample" newspapers in an attempt to gain new customers. Approximately 3/4 of a mile beyond where the last house to which the last sample was delivered and which was outside of the route area of Mr. Cobb, defendant Sims failed to stop at a stop sign and a collision occurred between Cobb's automobile and the automobile in which the plaintiffs were riding.

On March 27, 1969, the plaintiffs filed a complaint in the Circuit Court for the County of Berrien alleging that they had sustained serious personal injuries as the result of the negligent operation of the motor vehicle owned by Cobb and operated by defendant Sims. Plaintiffs also alleged that defendant Cobb was an "employee" of appellee newspaper and was acting within the scope of his employment at the time of the accident; and therefore, appellee newspaper, as employer of Cobb, was also liable to plaintiffs for their damages.

On May 18, 1970, appellee newspaper filed a motion for summary judgment asserting that defendant Cobb was not an employee, but rather was an independent contractor doing work for the Benton Harbor News Palladium; and therefore, the appellee newspaper could not be held liable to plaintiffs for any negligence of defendant Marion Cobb. On May 27, 1970, appellee newspaper filed an amended motion for summary judgment.

On July 13, 1970, the motion was heard by the Hon. Chester J. Byrns, Berrien County circuit

judge. The trial court in deciding the motion considered: (a) the pleadings; (b) the written interrogatories propounded by the plaintiffs to the said defendants and answered by Charles H. Bowie, circulation manager of the Palladium Publishing Company; (c) the two depositions of defendant Marion Cobb; (d) the Motor Route Lease agreement between defendant Marion Cobb and appellee Palladium Publishing Company; (e) the affidavit of Charles H. Bowie in support of appellee Benton Harbor News Palladium's motion for summary judgment; and (f) the parties' briefs and oral arguments.

The learned trial judge decided that Cobb was as a matter of law an independent contractor and granted appellee Bentor Harbor News Palladium's motion for summary judgment as provided by GCR 1963, 117.

Plaintiffs raise two issues on appeal which we consider in order.

## I.

Did the evidence presented in connection with appellee newspaper's motion for summary judgment, when viewed most favorably to plaintiffs, create a question of fact as to whether appellee newspaper maintained sufficient control over its news carrier Marion Cobb, to warrant a jury finding that Marion Cobb was, under the traditional test of employment, an employee of The Benton Harbor News Palladium?

The basis for relationship between the parties herein is the "Motor Route Lease" which is as follows:

"For and in consideration of the following covenants on the part of Marion Cobb, hereinafter re-

ferred to as the Lessee, The Palladium Publishing Company, a Michigan Corporation publishing The News-Palladium, at Benton Harbor, Michigan, hereinafter referred to as the Lessor, leases to Lessee a list of News-Palladium subscribers and the right to solicit additional subscribers living in an area described as follows:

"Covert, South Haven #9402.

"1. Lessee covenants and agrees as follows:

"(a) That he will purchase his newspapers from Lessor for $5.83 per hundred and sell and deliver said newspapers daily, except Sunday, to the subscribers on the above route at the established retail rate per subscriber, to wit: .55 per week; 2.40 per month; 7.20 quarterly; 14.40 semi-annually; 28.80 per year, and pay promptly each week to Lessor the sum of 5.83 per hundred on a settlement day to be determined by Lessor; and further, that he will make full and faithful accounting for advance collections from suctomers [*sic*] by Lessee.

"(b) That he will maintain an accurate and up-to-date subscription list of all customers, together with a road map of said customers; that he will disclose said list to no person except the Lessor which reserves the right of inspection of said list at all times; and upon termination of this lease, he will yield up said list as the exclusive property of Lessor to Lessor only.

"(c) That he will do (his, her) utmost to promote and expand the subscription list on the route described above; and that he will deliver no other publications on said route except as may be authorized in writing by the Lessor.

"(d) That he shall receive weekly from Lessor the sum of .07 per mile travelled in servicing said route as a mileage allowance, the Lessor reserving the right at all times to verify the mileage allowances claimed by Lessee; any unpaid mileage allowances may be held by Lessor in mitigation of any damage on its part as more fully set forth in Paragraph 3.

"(e) He shall, at his own expense, furnish to Lessor a fidelity bond in the penal sum of $1,000.00 with such sureties as Lessor may direct; in lieu, thereof, and at the discretion of Lessor, he shall deposit with Lessor the sum of 100.00 payable as follows: 92.00 down and 5.00 per week for — weeks, or until the total deposit has been paid; and that said bond or deposit shall be for (his, her) full and faithful performance of this lease. It is further agreed that lessor reserves the right to increase both the principal sum of this bond and the weekly accrual amount paid by lessee to correspond with the number of customers servised [sic] on said route as may be determined by periodic audit.

"2. Lessor may cancel this agreement at any time and without notice for good faith reason or reasons, including nut [sic] not limited to his physical or mental incapacity, failure to perform this agreement in all of its provisions, or intoxication. He may cancel this agreement by first giving Lessor 30-days notice of intention so to do.

"3. Any unpaid mileage allowance and/or the cash deposit described in subparagraph 1 (e) shall be available to Lessor, in whole or in part, in mitigation of any damage sustained by it through his breach of this agreement.

"In testimony whereof, the parties set their hands this 1st day of July, 1968.

"Lessee [signed] Marion W. L. Cobb
"Lessor PALLADIUM PUBLISHING COMPANY,
"Benton Harbor, Michigan
"By [signed] C. R. Bowie
"Circulation Manager

"Motor Route Deposit
"To: THE PALLADIUM PUBLISHING COMPANY
"Per your direction of even date, I hereby deposit 92.00 with you and agree to deposit further the sum of 5.00 per week until the sum specified in subparagraph 1 (e) is reached. Dated 1 July 1968
"Lessee [signed] Marion W. L. Cobb"

It was necessary for the trial court in considering and determining the motion for summary judgment to decide whether as a matter of law, defendant Cobb, a newspaper routeman, was an independent contractor or were there sufficient facts present to submit to the jury the question of whether Cobb was an employee of the newspaper publishing company? Although the burden was upon the plaintiffs to prove Cobb was an employee of appellee Benton Harbor News Palladium and that he was, at the time of the accident, acting in the course of his employment, all disputed facts were required to be resolved in plaintiffs' favor. *Durant* v. *Stahlin* (1965), 375 Mich 628.

The generally-accepted definitions of an independent contractor are stated in 41 Am Jur 2d, Independent Contractors, § 1, pp 737, 738, 739 as follows:

"There are many definitions of the term 'independent contractor.' One of the most frequently stated is to the effect that an independent contractor is one who, in exercising an independent employment, contracts to do certain work according to his own methods, without being subject to the control of his employer, except as to the product or result of his work. An independent contractor has also been defined as one who carries on an independent employment in pursuance of a contract by which he has entire control of the work and the manner of its performance; as one who contracts to do a specific piece of work, furnishing his own assistants and executing the work in accordance with either entirely his own ideas or a plan previously given to him by the person for whom the work is done, without being subject to the orders of the latter with respect to the details of the work; * * * . Accordingly, very broadly speaking, where an employer may prescribe what shall be done, but not how it shall be done or

who shall do it, the person employed is an independent contractor. The fact that the work is to be done under the direction, and to the satisfaction of, a person representing the employer does not render the person contracting to do the work a servant.

"While the aforementioned definitions, with only slight variations, may be found in judicial opinions in most jurisdictions, it does not appear that a concise definition of the term 'independent contractor' can be laid down which will be sufficiently specific, and yet comprehensive enough, to apply to all situations that may arise."

It is stated in 41 Am Jur 2d, Independent Contractors, § 6, pp 746, 747, as follows:

"As indicated above, the most important test in determining whether a person employed to do certain work is an independent contractor or a mere servant or employee is the control over the work which is reserved by the employer. Whether one is an independent contractor depends upon the extent to which he is in fact independent in performing his work. Broadly stated, if the contractor is under the control of the employer, he is a servant; if he is not under such control, he is an independent contractor."

It is further stated in 41 Am Jur 2d, Independent Contractors, § 8, pp 751, 752, 753, as follows:

"As a practical proposition, every contract for work to be done reserves to the employer a certain degree of control, at least to enable him to see that the contract is performed according to specifications. The employer may exercise a limited control over the work without rendering the contractor a mere servant or employee, as a relation of master and servant or employer and employee is not inferable from a reservation of powers which do not deprive the contractor of his right to do the work according to his own initiative, so long as he does it

in accordance with the contract. The control of the work reserved in the employer which effects a master-servant relationship is control of the means and manner of performance of the work, as well as of the result; an independent contractor relationship exists where the person doing the work is subject to the will of the employer only as to the result, but not as to the means or manner of accomplishment. Thus, a person employed to perform certain work is not necessarily a mere servant because the contract provides that the work shall be subject to the approval or satisfaction of the employer. Such a provision is not an assumption by the employer of the right to control the person employed as to the details or method of doing the work, but is only a provision that the employer may see that the contract is carried out according to the plans. A requirement that the work be performed according to standards and specifications imposed by the owner is not sufficient to establish the degree of control necessary to make a presumably independent contractor the agent of the owner, but the retention of the right not only to insure conformity with specifications, but also the retention or exercise of the right to direct the manner in or means by which the work shall be performed, will destroy the independent status of the contractor."

In the very similar case of *Gall* v. *Detroit Journal Co.* (1916), 191 Mich 405, it is stated on pp 408, 409, 410:

"The contract between the Detroit Journal Company and Rebtoy constituted a very plain and simple arrangement for an employment of an equally plain and simple character. Omitting the provisions relating to default or failure in performance, it amounted to just this: Rebtoy was to deliver the papers to such persons, at such places, and on such time as the company should from day to day desig-

nate. Such delivery was the result to be obtained. And Rebtoy was to effect such delivery and obtain such result by any means and by any conveyance and in any way he saw fit. He could make the deliveries in person, or through others employed by him. It is shown by the evidence that those making deliveries for the company did occasionally employ others to do the work. He could use a horse, an automobile, or carry the papers on foot, provided he got them to the right persons, at the right places, and upon time. So far as the terms of the contract are concerned Rebtoy was certainly an independent contractor and not a servant. One whom the employer does not control, and has no right to control, as to the method, or means, by which he produces the result contracted for is an independent contractor.    *    *    *

"Rebtoy did have a contract for a specific piece of work; that is, for the delivery of the papers. And it was none the less specific because the places to which the deliveries were to be made, and the persons to whom the papers were to be delivered, might change from day to day. The right, on the part of the company, to designate the persons and places was but a right to designate the result to be obtained, and did not give the company any control over the method for obtaining that result."

This Court stated in the case of *Kaniewski* v. *Warner* (1968), 12 Mich App 355, 358, as follows:

"At the present time the tort liability test for an independent contractor relationship is the right to control. *Gall* v. *Detroit Journal Co.* (1916), 191 Mich 405; *Holloway* v. *Nassar* (1936), 276 Mich 212. The facts now before us show that Warner could not exercise any supervision over Robson's method of operation. Warner did handle the financial aspects of Robson's accounts, but this limited involvement in the business does not amount to a right to control.

See *Sawtells* v. *Ekenberg Co.* (1919), 206 Mich. 246. The trial court was correct in holding that Robson was an independent contractor.

"Plaintiff's second contention on appeal is that because Robson hauled nothing but Warner's oil from December, 1963, until the date of the accident, Warner had 'exclusive use' of the truck and was therefore 'renting' it within the meaning of CLS 1961, § 257.37 (Stat Ann 1960 Rev § 9.1837). We will not foster such a strained statutory interpretation. Robson's title and unfettered control of his truck clearly demonstrate that Robson was the sole owner of the vehicle."

The trial court in rejecting the plaintiffs' claimed aspects of the facts that would require the court to deny the motion for summary judgment stated in his ruling on the motion in part as follows:

"1. That Cobb could sell and deliver only in a certain mapped-out area and that when he gave up this particular territory he had to return the map to the Palladium. This, however, was the franchise Cobb sought and contracted to service and it is the one he secured. This is not determinative of his status as an employee or an independent contractor and goes not to control of the means or method but to the contract that was made between the parties and the franchise that was granted. Further, the agreement with Cobb did not prohibit him handling other newspapers as claimed by the plaintiffs in opposition to this motion for summary judgment, but provided only that he first get authority from the Palladium to do it. As Cobb and the circulation manager of the Palladium acknowledged in the deposition and the answers filed in this clause, Cobb could deliver other newspapers as long as he kept his Palladium business up. Actually Cobb himself in his deposition said he could carry other noon and afternoon papers and actually was transporting the

South Haven Tribune. I believe that is in the file here.

*Off the record.*

(*Discussion off the record.*)

"*The Court:* Now, strike 'actually' and anything after that.

"He said at page 32 of his deposition that he could carry the South Haven Tribune but did not carry it because they paid less than the News Palladium but that another routeman for the Palladium did carry the South Haven Tribune.

"2. That he had to buy papers at a certain price and sell at a certain price. Actually realizing his compensation was the difference between the two prices for which he contracted, this is, if anything, most indicative of an independent contractor status. In *Gall* v. *Detroit Journal Company, supra,* the carrier held to be an independent contractor had no discretion or voice in what he charged his customers.

"3. That he had to keep an up-to-date subscription list which was to be confidential between him and the Palladium and that the Palladium would inspect it every six or eight weeks. The list was to be returned when he gave up his route. What plaintiffs miss is that defendant by his own contract only leased the subscription list and the right to solicit new subscriptions within his territory. The lists belonged to the Palladium at all times. This fact does not dispute an independent contractor status, but actually supports it.

"4. That Cobb was encouraged to get new subscribers and was only to carry the Palladium. The latter point has been covered in an earlier mention in this opinion. Earning money by getting new subscribers was why Mr. Cobb sought the route and the same cause was why the Palladium gave the route, and financial profit is the usual genesis for independent contractor. This is obvious and Cobb's own statement in his deposition taken by the plaintiff that getting more customers benefited Cobb be-

cause more customers meant more money for him. In mentioning this matter of carrying only the Palladium, I'd like to note also here that an independent contractor can, without becoming an employee or losing his status as an independent contractor, agree to carry or to sell only one product.

"5. That occasionally three or four times during his employement a Palladium employee would ride with him on his route to help him if he had trouble, the words that Cobb used; that a rubber band supplied by the newspaper and paid for by Cobb had to be placed around the newspapers; that the papers had to be put in a plastic tube, which tubes Cobb was required to place for new customers and remove on cancelled subscriptions. Surely all of this taken as true for this motion goes only to the interest of the Palladium in the results of the defendant's work. It is inspection or such supervision as may be necessary to secure the ultimate result of the Cobb-Palladium contract, recognizing that the purpose of the contract was to keep the Palladium subscriptions up and its customers satisfied and Cobb and the Palladium making their respective profits. The Cobb deposition does not suggest in this court's opinion that the few times a Palladium employee rode with him that it was for control, but the court is left with the impression in reading the Cobb deposition at best it was to help him if he needed assistance. Cobb in his deposition said he had to buy the rubber bands and the Palladium did prefer the use of bands, but that he could also fold the papers as well. The tubes were the property of the Palladium and neither Cobb nor the customers paid for the tubes.

"6. That Cobb had to do his accounting and billing on a form submitted by the Palladium. Again this is not a control over the working of a person by another that would create in law an employment relationship, but rather it is the assistance by a party using an independent contractor to insure

that the financial results for both are realized. It should be noted here that the bills were in the name of Cobb who himself received the payments from the customers. In this connection see *Kaniewski* v. *Warner, supra.*

"7. That Cobb while he was permitted to cancel a customer for nonpayment could not cancel for other reasons without the Palladium's permission. Certainly a newspaper interested in the results, to-wit, its sales, has a right, without losing the independent contractor status of a routeman, to know why the routeman proposes to cancel a customer in an area which the newspaper itself built up.

"8. That two weeks before he quit, the Palladium required Cobb to train a replacement. How this would change Mr. Cobb from an independent contractor to an employee, I must admit, defies my reasoning.

"9. That Cobb couldn't sell his route to whom he wished. That is not unusual realizing that the route was the property of the Palladium and was only leased to Cobb.

"10. That the newspaper could cancel the route at any time for good faith or reason, as more specifically read earlier into the opinion, while Cobb had to give the notice of cancellation. This does not create a control over the means or methods of work of Cobb, but goes to the termination of an independent contractor relationship. It should be noted in *Gall* v. *Detroit Journal Company, supra,* the newspaper there, where the routeman was held to be an independent contractor, wasn't even required to use any reason or any basis before cancelling.

"11. That Cobb was to keep his vehicle in good mechanical condition. Actually in this file the only reference to that was Cobb in his deposition mentioned that this was stated in an advertisement seeking carriers, to which advertisement he responded. In the deposition of Cobb taken by the plaintiff,

Cobb said that during his route he was never told by
the Palladium that he had to have his vehicle in
good mechanical condition.  Even if there was such
a showing or application of such a requirement, this
would not, in this court's opinion, change an inde-
pendent contractor's relationship into that of an
employee.

"Taken individually or collectively, all of the
claims of plaintiffs do not deny or challenge suffi-
cient to raise any jury question that Cobb was an
independent contractor, and this court so finds that
he was at the time of this particular event as a
matter of law."

In plaintiffs' brief on appeal it is also asserted
that a control as to methods and means of carrying
out the agreement was exercised by the appellee
newspaper over Cobb in that it required that Cobb
deliver the newspaper by a specified time each day.
On at least two occasions after complaints by custo-
mers were received, appellee newspaper brought to
Cobb's attention that the papers were delivered late.
In *Gall* v. *Detroit Journal Co., supra,* there was a
provision in the contract requiring delivery of the
newspapers according to a schedule and a penalty
was also exacted for failure to deliver on time. Such
a provision was held by the Court to be consistent
with construing the contract as creating an inde-
pendent contractor relationship.

Two depositions of Mr. Cobb were taken and
considered by the court in determining the motion
for summary judgment.  We deem certain portions
of these depositions suffiicently important to repeat
them here:

"*Q*. Who paid the social security and withholding
on the money that you made?
"*A*. I did.

"*Q.* So that you were required to keep track of social security and withholding tax yourself?

"*A.* Yes.

"*Q.* They told you you have to do this yourself?

"*A.* No, they didn't tell me, but I knew it.

"*Q.* How did you order the papers that you would need?

"*A.* Well, normally when I would pick up a new customer I would just call in and tell them to add one and drop one sample. I had 15 samples. They would add one paper and drop one sample.

"*Q.* The 15 samples were provided to you as a matter of course in promotional work?

"*A.* Yes.

"*Q.* This took place from the beginning and carried through all the time?

"*A.* Yes.

"*Q.* Were you permitted to leave the newspaper other than at a News Palladium tube?

"*A.* If the tube was missing I could put it in the mailbox. Occasionally I would throw it in their yard.

\* \* \*

"*Q.* Did you ever get new customers that had been obtained for you by the News Palladium through its own circulation office? What I mean is, did you ever get notification that there would be an additional customer on your route?

"*A.* Yes.

"*Q.* That you had not gotten yourself?

"*A.* Yes.

"*Q.* Now, were you required to service that customer whether you wanted to or not, as long as the customer paid?

"*A.* No. It was strictly up to me. If I felt I had more than enough customers I could handle, I could refuse to leave papers at this customer.

\* \* \*

"*Q.* Well, I'll ask you who provided the automobile?

"*A.* I did.

"*Q.* How about the gas?

"*A.* I did.

"*Q.* The oil and repairs?

"*A.* I did.

"*Q.* You did all those things?

"*A.* Yes.

"*Q.* You solicited customers?

"*A.* Yes.

"*Q.* Who picked the day that you collected?

"*A.* Me.

"*Q.* You selected the day that you'd —.

"*A.* Yes.

"*Q.* —collect from your customers?

"*A.* Yes.

"*Q.* I believe in the deposition that you testified that your wife sometimes rode the route with you, is that correct?

"*A.* Yes.

"*Q.* Where did you pick up those papers?

"*A.* Well, I originally started picking them up at Holly's Restaurant in South Haven, and then later on I had it changed to the Mobil Station in Covert. That was close to home.

"*Q.* In our answers to your interrogatories we said we believed you picked them up at Holly's Motel.

"*A.* Yes, its a restaurant and motel, together, combined.

"*Q.* You subsequently had that changed?

"*A.* Yes.

"*Q.* You had it changed?

"*A.* Yes."

We are constrained under the facts in this case to rule that the trial court properly determined that the plaintiffs failed to raise any issue as to a material fact pertaining to the liability of the appellee publishing company. *Durant* v. *Stahlin, supra.*

## II.

Should the test for determining the tort liability of an employer to an injured third party be based upon the theory of economic reality heretofore adopted by the Michigan Supreme Court as the appropriate test for determining employment relationship in workmen's compensation cases?

This issue was not presented to or ruled upon by the trial court.

The plaintiffs urge us to extend the economic reality test adopted by our Supreme Court in the workmen's compensation case of *Tata* v. *Muskovitz* (1959), 354 Mich 695, to tort liability cases.

This we decline to do in view of the fact that we would have to depart from the established law in tort liability cases as delineated in our discussion of the first issue herein. Our Supreme Court no doubt has had an opportunity to extend the test of economic reality rule to tort cases during the interim years since the *Tata* case was decided in 1959. In the absence of such a declaration by our Supreme Court we will await their word on the matter.

Affirmed. Costs to defendants-appellees.


R. B. Burns, P. J., concurred.


Levin, J. (*dissenting*). In the 55 years since *Gall* v. *Detroit Journal Co.* (1916), 191 Mich 405, was decided, the Michigan Supreme Court has decided six tort cases where the question presented was whether a person injured by the negligent automobile driving of a delivery man may recover from the business concern which hired him to deliver its goods under the circumstance that the delivery man owned the automobile and was purporting to act as an independent contractor. In each and every case

the Supreme Court ruled that the business concern was subject to liability. I have, therefore, concluded that *Gall* does not insulate a newspaper from liability for the negligent driving of a newsman delivering its newspapers.

A review of those six decisions is in order.

1. In *Eber* v. *Bauer* (1930), 252 Mich 571, a transit company appealed a jury verdict in favor of persons injured as a result of an automobile collision with a truck owned and driven by one Bauer. The Supreme Court declared that "the trial court was clearly right in holding that Bauer was an employee of the transit company" on the following facts: "The transit company was engaged in the delivery business. Bauer made trips for it from Chicago to points in Michigan and other states. He received instructions at the company's office in Chicago as to what merchandise or goods he should take, where to go for them, and where to deliver them". The Supreme Court declared:

"That he used his own truck instead of one furnished by the company did not change his status."

2. In *Marchand* v. *Russell* (1932), 257 Mich 96, 101, the Supreme Court held that on the record presented the relation of master and servant existed at the time of the automobile accident, and upheld a jury verdict against the defendant driver, a traveling salesman, and the company that he represented. The salesman was the owner of the automobile. He was required to call on dealers, collect amounts due the company, establish new dealers wherever possible and promote the sale of the company's products. The Supreme Court observed:

"Were it not for the fact that he used his own car, and that the expense of its operation and mainte-

nance, as well as his personal expenses when traveling about, was included in the weekly compensation paid him, the situation would be no different from that of the ordinary salesman traveling about and selling the goods of his employer."

3. In *Cooper* v. *Interstate Motor Freight Co.* (1933), 264 Mich 131, the defendant freight company, like the defendant newspaper company in *Gall,* sold a motor truck to a person who then entered into a contract with the freight company to deliver articles for it "as a contractor and not as an employee". The new owner of the truck was to use it exclusively in the service of the freight company and was to receive 70% of the actual freight charges. No specific tonnage was guaranteed. He agreed to maintain schedules, give proper and efficient service and deliver and haul freight for the freight company in accordance with its methods of handling. The truck was actually driven by the new owner's two sons. The Supreme Court declared "in the instant case a right of control was reserved and exercised by defendant to such a degree as to create the master and servant relationship", and, therefore, the new owner of the truck was the servant of the defendant freight company, not an independent contractor.

4. In *Lewis* v. *Summers* (1940), 295 Mich 20, 22, the defendant Summers, a beer distributor, engaged defendant Kass and his truck to make deliveries of beer. Kass was paid an agreed price per case of beer delivered. This was Kass' main employment. The Supreme Court declared that although Kass and not Summers owned the truck, "the issue of whether defendant Kass and his truck were in the employ of defendant Summers was for the jury".

5. In *Brinker* v. *Koenig Coal & Supply Co.* (1945), 312 Mich 534, the Supreme Court again upheld a jury verdict in favor of persons injured by a deliv-

ery truck delivering the defendant's goods although
the truck was owned by the delivery man and not by
the defendant.    The truck was operated by an em-
ployee of Willie Sawyer, the owner of the truck.
Sawyer had contracted with the defendant coal com-
pany to deliver its coal in his truck to customers of
the coal company.    The coal company selected the
coal, weighed it and directed where coal should be
delivered.    Sawyer was paid $1.30 per ton for deliv-
ery plus a wheeling charge of 50¢ per ton, if the coal
had to be wheeled in.    The Supreme Court ruled:
"Under the law as established in this state, we be-
lieve that the driver was defendant's employee".

6. Finally, in *Buehler* v. *Beadia* (1955), 343 Mich
692, a jury verdict for the plaintiff was affirmed by
an equally-divided court.    Four of the justices were
of the view that the trial judge erred in concluding
that the plaintiff was free from contributory negli-
gence and did not reach the question whether the
defendant truck driver was employed by the de-
fendant truck company.    The driver was the owner
of the truck, and had entered into a formal lease
hiring himself and the truck to transport freight
and merchandise for the truck company.    Mr. Jus-
tice BUTZEL, in an opinion signed by Justices TALBOT
SMITH, BOYLES, and KELLY, declared that there could
be no doubt that the freight company was the driv-
er's employer in light of the facts "that he was told
where and when to go; that the company paid him
[a flat amount plus a percentage of the gross freight
bill]; that he worked for the company exclusively;
and that his routes were generally restricted, *et
cetera*".

No tort cases presenting the employer-employee-
independent contractor question have been decided
by the Michigan Supreme Court since 1955.[1]

---

[1] *Cf. Schenk* v. *Packaging Corp. of America* (WD Mich, 1966), 267

In *Brinker, Lewis, Marchand,* and *Eber,* the Court relied on *Dennis* v. *Sinclair Lumber & Fuel Co.* (1928), 242 Mich 89, 92, a workmen's compensation case decided when the control test was still the standard by which the employer-employee relationship was determined in workmen's compensation cases.[2] In *Dennis,* John Dennis had been hired with the use of his truck to deliver coal in retail quantities to customers of a coal company. In holding that he was an employee, not an independent contractor, the Supreme Court observed:

"This Court has held that the test of the relationship is the right to control, whether in fact exercised or not [citation omitted]. Mr. Dennis served the lumber and fuel company, in accord with its direction as to each load, under its right to control his movements and command his services in carrying out its business requirements, and the company had a right to dispense with the same at will without liability."[3]

Recently, in *Osborn* v. *Recker* (1969), 16 Mich App 701, we declared that whether a milk truck driver was an agent of the defendant corporation was a question of fact.

F Supp 439, 440, where a United States district court, in granting a summary judgment to defendant packaging corporation, declared: "While it is possible that the Michigan Supreme Court will at some time in the future apply this principle [economic realities test] in the area of tort liability, at the present time the test for an independent contractor relationship is the right to control."

[2] In *Tata* v. *Muskovitz* (1959), 354 Mich 695, 699, and *Goodchild* v. *Erickson* (1965), 375 Mich 289, 293, the control test was abandoned as the exclusive criterion for determining the existence of an employer-employee relationship for purposes of remedial social legislation.

See *Foster* v. *Employment Security Commission* (1968), 15 Mich App 96, 99, 100.

[3] Similarly, see *Tuttle* v. *Embury-Martin Lumber Co.* (1916), 192 Mich 385, 400; *Van Simaeys* v. *George R. Cook Co.* (1918), 201 Mich 540, 546; *Hector* v. *Cadillac Plumbing & Heating Co.* (1924), 226 Mich 496, 503.

In the intervening period between the time *Gall* was decided and the present, I find but two cases decided in this state, one by the Supreme Court and the other by our Court, holding that a business concern named as a defendant and alleged by the plaintiff to be the driver's employer was not his employer.

*Holloway* v. *Nassar* (1936), 276 Mich 212, is distinguishable because in that case the traveling salesman only occasionally delivered goods. Most of the goods he sold were delivered by company trucks. Additionally, in contrast with the present case, he could attend customers by telephone as well as personally and could add new customers or drop old ones as he saw fit.

*Kaniewski* v. *Warner* (1968), 12 Mich App 355, was decided by our Court on the authority of *Gall* and *Holloway*. No mention was made of the other Supreme Court decisions above cited. In *Kaniewski* the owner-driver, Robson, was not obliged to purchase oil from defendant Warner and could, in contrast with the present case, have delivered someone else's oil products. Therefore, Robson, unlike newsman Cobb, could not have been put out of business at the whim of the enterprise defendant.

The facts of this case, as revealed in Cobb's depositions, demonstrate that it was at least a jury question whether he was an employee of the Benton Harbor News Palladium; a summary judgment should not have been granted. Cobb obtained his route in response to an ad for a motor route operator which he observed in the male help-wanted section of the Benton Harbor News. The route was owned by the newspaper; it was merely leased to Cobb under a lease cancellable by the newspaper at any time without notice "for good faith reason". Cobb agreed not to deliver other publications and he had no other occupation. He was paid $28 a

week as reimbursement for the cost of operating his automobile. When he experienced difficulty an agent of the newspaper would ride with him in an effort to iron out the problem; this occurred a number of times.

It is obvious that the nature of the task to be performed was such that there was little, if any, room for independence in performance by a news delivery man. The delivery procedure was structured so that he had hardly any individualized judgment to exercise except in the operation of his automobile.

The newspaper route customers were the newspaper's, including any new customers that Cobb might obtain. Cobb could not cancel a customer except for nonpayment without first consulting the defendant newspaper and receiving permission.

Defendant Benton Harbor News determined when the newspapers were to be picked up and the time within which they were to be delivered, a span of just a few hours. It directed the manner in which the newspapers were to be rolled, banded, and deposited in tubes, which it supplied, mounted on stands along the side of the road. It established billing procedures and credit policies and the manner of bookkeeping. It is hard to imagine what, if anything, was left for Cobb to decide.

Cases from other jurisdictions affirming verdicts against newspapers or setting aside directed verdicts in their favor where the plaintiff's injuries were caused by the neligence of a newsboy or distributor using his own vehicle include *Wilson* v. *Times Printing Co.* (1930), 158 Wash 95 (290 P 691); *Wallowa Valley Stages, Inc.* v. *The Oregonian Publishing Co.* (1963), 235 Or 594 (386 P2d 430); *Harris* v. *Cochran* (Tex Civ App, 1956), 288 SW2d 814;

*Dispatch Publishing Company* v. *Schwenk* (1941), 109 Ind App 223 (34 NE2d 150); *Femling* v. *Star Publishing Co.* (1938), 195 Wash 395 (81 P2d 293); *Semper* v. *American Press* (1925), 217 Mo App 55 (273 SW 186); *Hampton* v. *Macon News Printing Co.* (1940), 64 Ga App 150 (12 SE2d 425); *Joslin* v. *Idaho Times Publishing Co.* (1939), 60 Idaho 235 (91 P2d 386); *Gallaher* v. *Ricketts* (La App, 1939), 187 So 351; *Cooper* v. *Asheville Citizen-Times Publishing Co.* (1963), 258 NC 578 (129 SE2d 107).[4]

---

[4] See, generally, Restatement of the Law 2d, Agency, § 220, p 485, and accompanying commentary, regarding the criteria for determining who is a servant.